SAMUEL GARDINER, Appellant, *v.* WILLIAM C. GARDINER and others, Respondents.

Testamentary capacity is mainly a question of fact, to be determined by the testimony of witnesses examined before the surrogate when the will is propounded for record, &c.

To establish undue influence over the testator at the time of executing his will, it must be made to appear that the importunity or influence was such as to deprive the testator, at the time, of the free exercise of his will.

Influence arising from gratitude, affection, or esteem, is not sufficient.

*A. J. Abbott*, for the appellant.

*Scott Lord*, for the respondents.

| 34 | 155 |
| 111 | 247 |
| 111 | 527 |

DAVIES, J. The respondent, William C. Gardiner, propounded for probate to the surrogate of Livingston county the will of his mother, Jane Gardiner, bearing date January 19, 1859, and a codicil thereto, dated April 6, 1861. She died on the 20th of October, 1861. The surrogate admitted the will to probate, and, on appeal, his decree or judgment was affirmed by the Supreme Court. The appellant, the contestant before the surrogate and the son of the testatrix, now appeals to this court. The appellant and the respondent, William C. Gardiner, were the only children of Samuel and Jane Gardiner, and had both been in business, and had failed and were insolvent at the death of their father in 1857, and of their mother in 1861. Samuel Gardiner, the father, made his will in 1849, giving all his estate, both real and personal, to his wife Jane, and in his will advised and requested his wife " that she should not at any time thereafter undertake to pay the debts of others, or become responsible for the payment of any debts beside her own." This clearly referred to the debts owing by the two sons, and to expected importunities to assume liabilities on their behalf. He also desired his wife, when she had any surplus funds on hand, " in case our children are in want, to advance to them, from time to time, as may be convenient for her, small sums, not exceeding fifty dollars at a time, as she may judge expedient." At the

time of the testatrix's death, she was possessed of real estate of the value of about $9,300, and of personal estate of the value of $2,061, and household furniture of the value of $550.71. By the will of 1859, she gave to the wife of the respondent, William C. Gardiner, during her natural life, the rents, issues and profits of real estate of the value of $5,500, and the remainder thereof to the two children of William C. Gardiner. She also gave to the wife of William C. Gardiner, during her natural life, the use and income of the household furniture in the house occupied by the deceased, and three-fourths of the residue of her personal estate; the remainder thereof to the two children of the said William C. Gardiner—such furniture being of the value of $550.71, and the three-fourths of such residue of personal estate being of the value of $1,544.19; making the total value of real and personal estate given for the wife and to the children of the respondent, William C. Gardiner, $7,594.90. If to this be added the sum of $500, for which William C. Gardiner was indebted to the testatrix, for money loaned by his father to him in his lifetime, and four years' interest thereon to the time of the testatrix's death, in all $640, it would make a total sum of $8,234.90. By her will, the testatrix gave to the wife of the appellant, Samuel Gardiner, during her natural life, the rents, issues and profits of real estate of the value of about $3,800, and the remainder thereof to the two children of the appellant. She also gave to the wife of the appellant the use and income, during her natural life, of one fourth part of the residue of her personal estate, amounting to the sum of $515.06, and the remainder thereof to the two children of the appellant, making a total of real and personal estate given for the wife and to the children of the appellant, $4,315.06. At the time of the death of his father, the appellant was indebted to him on two notes, one for $1,128, and the other for $250, which sum, with four years' interest, would amount to $1,763.84; and the testatrix advanced, during her lifetime, to him, for which she took his notes, the further sum of $426, which, with interest thereon up to the time of her death, amounted to about the sum of $475.

The testatrix supposed, as it appeared by the testimony, that the indebtedness of the appellant to his father at the time of his death was at least the sum of $4,000. The indebtedness of the appellant to the testatrix, at the time of her death, including the notes given to his father and held by his mother, and interest thereon, together with the value of the property given to the appellant's wife and children, amounted in the aggregate to about the sum of $6,556.90. If the indebtedness of the appellant to his father had been what the testatrix supposed it to be, then the further sum of at least $2,500 should be added to the last total, and which, on that hypothesis, would show that the appellant and his family had received from the estates of his father and mother over $9,000. One of the children of the respondent, William C. Gardiner, having died after the making of the will, the codicil of April, 1861, was made, to meet the contingency which had arisen. By it, the remainder given by the will to such deceased child was given and bequeathed to his surviving sister.

It is insisted, on the part of the appellant, that the will is void, upon two grounds: First, that the testatrix, at the time of making the will and codicil, had not testamentary capacity. Second, that the will was procured by undue influence on the part of the respondent, William C. Gardiner.

It is also insisted that the surrogate erroneously admitted certain evidence objected to on the part of the appellant, and which will be more particularly adverted to hereafter.

In reference to the first question to be considered, namely, the testamentary capacity of the testatrix, it should be observed, that this is mainly a question of fact, and has been found adversely to the appellant by two tribunals—the one the primary, which had the great advantage of a personal inspection of the witnesses, and the opportunity of witnessing their manner of testifying. These circumstances give to that tribunal peculiar opportunities for weighing the testimony, and giving to the respective witnesses that consideration to which their evidence is entitled. Where there is a conflict of testimony, such circumstances are of peculiar significance.

The testatrix was about seventy years of. age at the time of her death. From the death of her husband, in 1857, up to her own decease, she had taken care of and managed the estate given to her by his will, and the testimony shows indisputably that she did this understandingly and properly. The two attesting witnesses to the execution of the will and codicil are emphatic in their statement that she was, at the time, of sound mind and memory. Mr. Ward, one of these witnesses, had been her pastor for about twelve years preceding her death, and had seen her very often during that time; part of that time he had resided in the same house with her, and the remainder in her immediate neighborhood. He states that she was of sound mind at the time of the execution of the will and codicil. He also stated that he conversed with her several times about the state of her health, for a year or so before her death. He noticed, perhaps a year and an half before her death, that her health appeared to be failing, and upon inquiry she would say that her health was poor: this was the case for a year and an half, more or less, before her death. She was not confined to her house, but walked in the street, and attended church. He did not discover any weakness of mind, but a disturbed or excited state of mind. This is a fair statement of the general character of the testimony; and it falls far short of maintaining the position, that she was of unsound mind and memory.

Dr. Lauderdale testified that he attended the same church with her, and had been her family physician for the last five or six years of her life; that she was as capable of taking charge of property as women in general; that she appeared to be a woman who had a mind of her own. Mr. Lord, a respectable and distinguished counselor-at-law, who drew the will and codicil, testified that on both occasions when they were prepared, the testatrix came to his office, unaccompanied by any one, conversed with him about them and their provisions, and gave him the instructions to prepare and draw them.

After a very careful examination of the testimony contained in the record, my mind unhesitatingly arrives at the same

conclusion as that reached by the surrogate and the Supreme Court, namely, that the deceased was of sound and disposing mind and memory at the time of the execution of the will and codicil.

The next question for consideration is, were the will and codicil procured by undue influence of the respondent, William C. Gardiner? It is to be borne in mind that both of the sons of the deceased were insolvent, and that, if the deceased should die intestate, her property would necessarily be taken by their creditors, and the families of her sons would be left entirely unprovided for. It therefore became essential to their support and comfort that she should make a will. To this she was frequently advised, and it was expected by both sons that she would do so. No complaint is made of the manner of the disposition of her property; but the appellant insists that his family should have been made equal to that of his brother. He contends that it has not been; and this is the burden of his complaint. The appellant testified that, in a conversation he had with his mother after she made her will, he told her that his father had always said that when he and mother got through with the property, it should be equally divided between us boys; that she said she had always intended that the property should be equally divided. She said she wanted to will the property to our wives — to my wife; that what she gave to me she wanted to give to my wife, for the reason that my brother and I were both insolvent, but she would much rather have it willed directly to us. I told mother I was settling up my old matters, and should probably have them all settled up in a short time. She said she hoped both William and myself would exert ourselves to settle up old matters, and as soon as we had done so she would arrange matters differently; that she then said, when I got my matters settled she would give my half of the property directly to me; she would make a new will. It is quite clear from this testimony of the appellant, that no complaint exists as to the manner of the disposition made by the testatrix. He perfectly understood and acquiesced in his mother's sugges-

tions, that whatever she gave him was to be given to his wife. It was only when his old matters were settled that she was to make a new will, and give him the property directly. What he expected, and all he had any grounds to claim, was one-half of the property of his father which might be left after providing a support for his mother during her life, or the half of what she might have at the time of her death. To ascertain whether this expectation has been fulfilled, and no injustice done to the appellant on this theory, it is proper to take into consideration what he received and what his brother received from their father in his lifetime. The testimony discloses that the appellant was certainly indebted to his father in the sum of $1,378, and his brother in the sum of $500. The testatrix supposed the indebtedness of the former was at least $4,000. From what source she obtained that impression, does not appear. The appellant was also indebted to his brother in about the sum of $1,500, which was secured by a chattel mortgage. It was a conceded debt by the appellant, and one which he was equitably as well as legally bound to discharge. There was nothing unjust to him in his mother assuming it as a debt due to her, and promising her son William that if Samuel did not discharge that indebtedness she would. Assuming that, in the distribution of her estate, she intended that her son William, or his family, should have the benefit of this indebtedness, it will be seen that she made such distribution as substantially effectuated her intention, as declared to the appellant, that the property should be equally divided between the two brothers or their families. As we have seen, there was given by the will to the family of Samuel real and personal estate valued at $4,315.06. Debt due by Samuel to his father, $1,378, and two years' interest thereon amounts to $1,570.92. The moneys advanced by testatrix to her son, with interest, say $475. The debt due by Samuel to his brother, at least $1,500. These sums make a total of $7,860.98. The value of the property, real and personal, given to the family of William, including the debt of $500 due from him to his father, was $8,094.90. This trifling inequality is not adequate to deduce

therefrom a supposition that any undue influence had been exerted by William to procure any advantage over his brother. It conclusively demonstrates that the testatrix carried into effect substantially the intention avowed to the appellant, that the two brothers, or their families, should participate equally in the property of their father and that belonging to her. That equality seems to have been maintained with almost scrupulous fidelity; and, as it is all the appellant seeks, he has no just cause of complaint. But if the inequality in distribution existed, as claimed by the appellant, it would afford but slight ground to assume that any undue influence had been exerted to produce it. Indeed, the testimony would seem to establish that the testatrix was a woman of marked independence of character and fixedness of purpose. It is evident, also, that she relied more on her son William for advice and aid in the conduct and management of her affairs, than upon the appellant. It is apparent, too, that the wife of William was more of a favorite with her, than was the wife of the appellant. She was a frequent visitor at her house; and soon after the making of the will, the testatrix went to the city of New York to make a long visit at William's house. The will cannot, therefore, be said to be an inofficious testament. There is nothing unreasonable in any of its provisions, or inconsistent with any duty the testatrix owed to any of the members of her family. A learned text-writer on wills deduces the following rules or principles from adjudged cases, and that the influence to avoid a will must be such as,

1. To destroy the freedom of the testator's will, and thus render his act obviously more the offspring of the will of others than his own.

2. That it must be an influence specially directed towards the object of procuring a will in favor of particular parties.

3. If any degree of free agency or capacity remained in the testator, so that, when left to himself, he was capable of making a valid will, then the influence which so controls him as to render his making a will of no effect must be such as was intended to mislead him to the extent of making a will

essentially contrary to his duty; and it must have proved successful, to some extent, certainly. (Redfield on Wills, 524.)

Without recapitulating all the testimony bearing on this question of undue influence, it is sufficient to observe, that it entirely fails to establish either of the above propositions. Indeed, it may be well said, taking into view the actual dispositions made by the will, there is really no proof of undue influence, nor any motive apparent for the exercise of any. If the influence be undue, it must be such as has worked some wrong to some one. If the influence which has been exerted has only been to give effect to the testatrix's previously declared intention of producing equality between the brothers or their families in the distribution of her estate, and that result has been substantially attained, then such influence is not undue. The subject of undue influence has lately received a careful consideration in the English Court of Probate. In the case of *Earl Septon* v. *Hopwood* (1 Fost. & Finl., 578), it was held, that, supposing a will to be made by a person of testamentary capacity, it is not sufficient to avoid it that it is not such a will as a sensible person would make, or that it is harsh, capricious and unjust; nor, on the other hand, is it sufficient to avoid it on the ground of undue influence that it was made as the result of acts of attention and kindness; but the influence or importunity must be such as to deprive the testator of the free exercise of his will. * * *  Undue influence must not be such as arises from the influence of gratitude, affection or esteem; but it must be the control of another will over that of the testator, whose faculties have been so impaired as to submit to that control, so that he has ceased to be a free agent, and has quite succumbed to the power of the controlling will. This same subject has been very ably discussed by Chief Justice LOWRIE, in the case of *Dean* v. *Negley* (41 Penn. St. Rep., 312). He says: "Lawful influence, such as that arising from legitimate family and social relations, must be allowed to produce its natural results, even in influencing last wills. However great the influence thus generated may be, it has no taint of unlawfulness in it; and there can be no

presumption of its actual unlawful existence, merely from the facts that it is known to have existed, and that it has manifestly operated on the testator's mind as a reason for his testamentary dispositions. Such influences are naturally very unequal, and naturally productive of inequalities in testamentary dispositions; and as they are lawful in general, and the law cannot criticise and measure them so as to attribute to them their proper effect, no will can be condemned because the existence of such an influence is proved, and because the will contains in itself proof of its effect. It is only when such influence is unduly exerted over the very act of devising, so as to prevent the will from being truly the act of the testator, that the law condemns it as a vicious element of the testamentary act." In a late case in the same State (*Eckert* v. *Flowry*, 43 Penn., 46), the same court held, that undue influence, to avoid a will, must be such as to overcome the free agency of the testator at the time the instrument was made. It must be a present constraint, operating upon the mind of the testator at the time of the testamentary act. And when undue influence was charged upon the executor, and no evidence was given of any influence exerted by him over the testatrix at the time of making her will, nor of any fraud, misrepresentation or constraint of any kind whatever in procuring a will in his favor, it was held to be error to submit the question to the jury whether any such undue influence had been exerted by him.

I fail to see in the record any evidence of such control in the present case over the mind and will of the testatrix. She is shown to have been a woman of independence and fixedness of purpose. It is true that her son William was in the house with her at the times the will and codicil were executed. But he gave no instructions as to the provisions of either, and was not present when they were given. The provisions of the will, it has been shown, were in accordance with, or nearly so, of previously declared intention. The codicil was a natural sequence of the previous action and determination. It in effect was to prevent the creditors of either of her sons from obtaining any portion of her estate, and for more effectu-

ally securing that portion of it designed for the family of her son William to his surviving child. In seeking to ascertain whether an act has been done by a particular person, it greatly aids in arriving at the truth to inquire who had a motive to do the particular thing. *Cui bono fuerit*, is always a pertinent and important inquiry. In the present instance, we have seen that the respondent, William C. Gardiner, had no motive which was not legitimate to procure or desire the will as made by this testatrix. It secured nothing to himself personally, and only that to his family which would seem to have been intended both by the testatrix and her husband, and expected by the appellant, namely, an equal distribution of the property left by the testatrix. If the respondent suggested or desired the codicil to be executed, it was legitimate and proper that he should have done so. It was only to make certain and effectual the previous disposition. In the absence of any special motive on the part of the respondent, or of proof that he exercised any such undue influence, we must concur with the court below, that the will and codicil cannot be avoided on any such ground.

There remains to be considered the testimony admitted by the surrogate, notwithstanding the appellant's objections. It should be observed, preliminarily, that we have not before us a bill of exceptions, or called upon to determine whether testimony may not have been admitted which might have improperly influenced a jury. In the class of cases now under consideration, we examine the case here as *res novo ;* and if satisfied upon the case that the judgment is correct, we should not reverse it and order a new trial from the fact that evidence had been improperly received, especially if we see that such evidence could not legitimately have influenced the result. The question put to the witness, George Mercer, and objected to by the appellant, was this: "From your observation and acquaintance, did you think she was mentally incapable of transacting ordinary business?" It is to be observed that this question was put on cross-examination of the appellant's witness, and might well have been proper to fathom the extent of the witness' knowledge of her business

capacity. The answer was favorable to the appellant, and it could not, therefore, have worked any prejudice to him. It was of but little moment, in any view, on the question of testamentary capacity. The next objection insisted on, was that to this question put to the witness, Elizabeth P. Gardiner: "Was she, the testatrix, a woman of decision and independence?" It can hardly be urged that this question asked for the opinion of the witness. It called for a fact, which was legitimate and pertinent to the inquiry, whether the testatrix had been controlled in the making of the will and codicil. The question was not one calling for the opinion of the witness, no more than the question put to the other witnesses, whether the testatrix was of sound and disposing mind and memory. The witness, in answer, stated a fact, and one which the proponent had a clear right to prove. The question put to the witness, Betsey Oliver, may, perhaps, be of the character calling for an opinion. It was this: "What do you think of her capacity to do business?" This was objected to by the appellant, and the objection overruled. She answered: "Think she was capable of attending to her business." The appellant's counsel is in error in supposing that this question called for the opinion of the witness as to the testamentary capacity of the testatrix. It was directed to her capacity for business only, and did not necessarily establish or deny her testamentary capacity. In cases like the present, this court have settled the rule that opinions are admissible. (*De Witt* v. *Barly*, 17 N. Y., 340.) The subject is very ably and exhaustively discussed by Judge SELDEN, and his remarks are equally applicable to the present case. After answering many of the suggestions contained in the prevailing opinion in the same case, as reported in 5 Seld., 388, he says: "I am entirely unable, therefore, to see the force of the grounds upon which he comes to the conclusion that the opinions of witnesses, in cases like the present, should, upon principle, be excluded. It is plain, from what has been said, that, to adopt that conclusion, would place this court in a position directly antagonistic to that of nearly every court, both in England and in this country, which has

had occasion to pass upon the question." The question of the admission of opinions was distinctly and sharply presented in this case, and this court held the same admissible. The able treatise on wills already referred to (Redfield on Wills, 136), contains a review of the cases in reference to admission of opinions of witnesses, and the general rule he deduces is, that it is competent to give the opinions, but they must be accompanied by the facts upon which they are based. In a recent case in Pennsylvania (*Wilkinson* v. *Pearson*, 23 Penn., 117), it was decided that a witness, after testifying to facts within his own observation, affecting the grantor's state of mind and capacity, might be asked whether, from his general appearance, he considered him capable of making a contract or transacting important business. Bearing in mind always that the jury or tribunal charged with the investigation are to judge of the correctness of the opinion from the facts disclosed, and that an opinion, without the facts being stated upon which it is based, is of little or no value, it is not seen, with this qualification, that any injury is likely to result from the admission of opinions in this class of cases. If, therefore, the questions propounded to these witnesses called for their opinions, they were unobjectionable upon principle and the authorities cited.

The judgment appealed from should be affirmed.

All the judges concurring,

Judgment affirmed.