JAMES H. SEGUINE, Appellant, v. HENRY L. SEGUINE
AND Others, Respondents.

*Will— Testator— Capacity— Undue Influence.*

Under our law a testator, having testamentary capacity, and being free
from improper influence, can make what disposition of his property he
please. If capacity, formal execution, and volition concur, the will, however
absurd or unjust, must stand.

Undue influence, in such a sense as to avoid a will, must be an influence
exercised by coercion, imposition, or fraud, and not such as arises from the
influence of gratitude, affection, or esteem. It must be the ascendency of
another will over that of the will of the testator.

APPEAL from a judgment of the Supreme Court, affirming a
decree of the Surrogate of the County of Richmond, admitting to
probate the will of James S. Seguine, deceased.

The will in question was executed on the 22d May, 1859, at
Rossville, in the county of Richmond, at the house of the testa-
tor's brother, Henry L. Seguine. The testator died at his resi-
dence at Deep Creek, in the State of Virginia, on the 11th of
January, 1860, leaving an only son, James Henry Seguine.

The executors named in the will, on the 20th January, 1860,
propounded the same for probate before the Surrogate of Rich-
mond County; and it was opposed by the testator's·son, on the
ground of a want of testamentary capacity in the deceased, and
further, that it was procured by undue influence. The question
of capacity was principally litigated; the contestant claiming
that, through intemperance and disease, the deceased was incom-
petent to make a will, or if not legally incompetent, was *imbecile,*
and in that condition was unduly influenced. The testimony
taken before the Surrogate fills a volume of 600 pages, most of it
on the part of the contestant, relating to the condition and habits
of the testator, and of matters transpiring in the summer and fall
of 1859, at Rossville, after the making of the will. It is imprac-
ticable to give anything like a precise analysis of the voluminous

testimony, nor is it important. The prominent and material facts are referred to in the opinion.

On the 15th October, 1864, the Surrogate made a decree admitting the will to probate. The contestant appealed to the Supreme Court, in the Second District, where the decree was affirmed, and he now brings an appeal to this Court.

*A. W. Bradford* for Appellant.

*A. C. Bradley* and *S. Hunt* for Respondents.

WRIGHT, J.—James S. Seguine, the validity of whose will is the subject of this appeal, died at his residence, at Deep Creek, in the State of Virginia, on the 11th of January, 1860, at the age of about fifty-five years. He was born in the county of Richmond (Staten Island), his family being an ancient one in the county, but from early life had resided and was engaged in business in Virginia. His business was mainly lumbering in the Dismal and other Southern swamps ; but in connection therewith he built and owned shares in several vessels employed in the transportation of his lumber and other freight. This business was continued until his death.

He left· an only son, the Appellant, who was a few months old at the death of his mother, in 1838. His other near relatives were a sister, the widow of a Mr. Guyon, and a brother, Henry L. Seguine.

The brother and sister always resided on Staten Island, as did the son, who was reared in the family of the sister—the deceased, after the death of his wife, never marrying again, or keeping a domestic establishment. He had lodgings in Virginia, where he spent most of his time, visiting the North in the summer season ; and on such occasions, and when north on business, made his brother's house, on the island, his home.

The deceased had accumulated an estate, at his decease, of probably something over $100,000. With the exception of a farm on the island, formerly belonging to his father, purchased by him in 1858, and fitted up and improved at a cost of some $15,000, as a home for his son, his property was principally personal, con-

sisting of money invested in Virginia, and at the North. By his will, executed in May, 1859, some seven months prior to his death, and on his last visit to the North, after giving specific legacies to the amount of $2,000, he gave to his sister, Mrs. Guyon, an annuity of $500; to his son, James Henry Seguine, an annuity of $700, and also an estate for life in the homestead farm purchased for him in 1858, remainder to his son's children—if no children, to his grandchildren, with a direction to the executors to expend the further sum of $4,000 in improving the farm for the son's use; and to the brother, Henry L. Seguine, the residue of the estate.

No point is made that the requisite statute formalities, to sustain the execution of the paper as the will of the deceased, were not duly observed; the objection being as to the testamentary capacity of the deceased, and whether the will was, or was not, procured by undue influence of the chief beneficiary. The bulk of the property, it is true, is given to the testator's brother; and it may be conceded that the will is a will inofficious, so far as regards his son. But if the son had been wholly disinherited (which he is not, but a moderate competency given to him), not in favor of the brother, but of parties strangers in blood to the deceased, it would be no ground, of itself, for avoiding the instrument.

The doctrine of inofficious testaments invoked from the books has no place in our law. A man has a right to make whatever disposition of his property he chooses. If capacity, formal execution, and volition appear, his will, however absurd or unjust, must stand. "A disposing mind," says Cresswell, J., in Earl of Sefton *v.* Hopwood (1 Fos. and Fin. 578) "does not mean that a man should make what other people may think a sensible will, or reasonable will, or a kind will, because, by the law of this country, a man has absolute dominion over his own property; and if he, being in possession of his faculties, thinks fit to make a capricious will, a harsh will, or cruel will, you have no right to interfere; that would be to make his will for him, and not to allow him to make it." "The right of a testator to dispose of his estate," said Porter, J., in delivering the opinion of this Court in Clapp

*v.* Fullerton (34 N. Y. 197), " depends neither on the justness of his prejudices, nor the soundness of his reasoning. He may do what he will with his own ; and if there be no defect of testamentary capacity, and no undue influence or fraud, the law gives effect to his will, though the provisions are unreasonable and unjust" (Grindall *v.* Grindall, 4 Hag. Ec. R. 1 ; Wrench *v.* Murray, 3 Curt. 623 ; Butlin *v.* Barry, 1 Curt. 614 ; Peck *v.* Cary, 27 N. Y. 18).

If the deceased, then, possessed the requisite testable capacity, and the instrument was the free emanation of his will, it is valid, and is entitled to probate ; and it is incumbent upon us so to adjudge, much as, in another sense, we might be inclined to regard the narrow provision for the son, in view of the deceased's wealth, as unjust and undutiful.

There are, therefore, but the two questions—was there capacity, and freedom from restraint ?

As to capacity. The evidence as to the general capacity of the deceased is but one way. The case is not a balanced one, but one where the evidence greatly preponderates on that subject. The deceased, as has been stated, had been actively engaged in lumbering in Virginia for over thirty years, and, according to all the testimony, was an unusually shrewd and energetic business man. His mind was clear, vigorous, and strong. He was also a firm man, decided, self-reliant. A witness characterizes him (and this was the tenor of all the proof) as a man of " great capacity for business, remarkable for his firmness, self-reliance, and tenacity of purpose." That clearness, solidity, and strength, were the general mental characteristics evinced by him throughout most of his life, is not questioned by the Appellant. But it is insisted that disease and intemperance, within the two years prior to his death, effected a change in his mental condition ; and that when the will was made he was insane, or if not properly insane, was imbecile. The suggestion that insanity existed in any form, or that the testator's mental faculties were perceptibly impaired at the time of the factum, is wholly unsustained by the proof. On the contrary, the proofs establish the fact that, at that time, his mind was as vigorous and sound as it had ever been. The

instrument was prepared by Lot C. Clark, Esq., for many years his legal adviser in relation to his affairs at the North. Mr. Clark was alone with him in his room, at his brother's house, some two or three hours, conversing in respect to his property, receiving his instructions, getting his exact views in regard to the provisions of the will, his slaves, and the laws of Virginia and North Carolina as to them, and in drawing the instrument as it was finally executed.

All the directions for drawing it were given by the deceased, without a suggestion from any other person. He exhibited a will which had been made by him the year before, and which had been drawn by Judge Metcalf, the Surrogate of the county, and suggested the alterations he desired to make, assigning his reasons therefor. He named as witnesses Dr. Edgar, for many years his attending physician when visiting at the North, and Judge Winant, a friend from boyhood, and requested Mr. Clark himself to sign as a witness.

According to the testimony of Mr. Clark, "he was as clear in mind and faculties as he had ever known him; his mind was perfectly sound and clear." Dr. Edgar, long and familiarly acquainted with his physical and mental characteristics, constitution, and habits, "considered him of sound mind," and Judge Winant, the other subscribing witness, concurred with them in opinion. Judge Winant, after the will was executed, conversed with him at large respecting his health, and in reference to several improvements in which he was interested in Virginia; in which conversation he indicated no defect of mental capacity, but full intelligence. He subsequently died while with the family. In addition to this proof, eight witnesses, residents of Virginia, knowing him well for many years, testified that, down to his leaving Deep Creek for the North, some ten days before making the will, his mental condition remained as good as they had ever known it; and Dr. Anderson, called as a consulting physician three days after the will was executed, represented his "intelligence to be perfect." This evidence, which was wholly uncontradicted, tends to sustain the conclusion that, instead of the deceased's being a

person of permanently diseased intellect at the time of the execu-
tion of the will, there were no sensible indications that his rather
unusual powers of mind had even begun to decay.    He was, it is
true, broken in health, having from youth been a sufferer from gout,
which was hereditary, and which at length caused an affection of
the heart and dropsy ; the latter diseases developing themselves
in connection, in the spring of 1859.    Such constitution as he
had was nearly broken down ; and though death was not to be im-
mediately apprehended, the issue was, as the physicians who ex-
amined his case, some three days after the execution of the will,
expressed it, "to be merely a question of time."    But no one in-
timates that his bodily infirmities had then, if ever, led to any
mental disturbance, or enfeebled his intellect in any appreciable
degree.    Neither has the suggestion any foundation that indul-
gence in intoxicating liquors had then impaired his mind.

It appears that, although not totally abstaining, he had for most
of his life been abstemious in the use of liquor.

A year or two before his death he indulged in a more free use
of it, but not apparently to excess—at least, before the summer and
fall after making the will.    In 1858 he spent the months of May,
August, and September at Rossville, when he could not have
drank to any marked extent, for no one suggests that he was ever
under the influence of liquor in the slightest degree.    Prior to his
visit to the North in 1859, he was shown to have been partially
affected by it, in two or three instances, in Virginia, but was never
seen intoxicated.    Nor was he under its influence to any extent
when the will was made.

In view of these facts, there is no color for saying that his in-
dulgence in intoxicating liquors, previous to the factum, had affect-
ed his mind or his capacity to make a will.    Nor, if it were at all
important, does the evidence warrant the conclusion that his use of
stimulants, during his stay and last illness at Rossville, after making
the will, reduced his mind to a state of general incapacity for the
performance of a testamentary act.    Such a conclusion is at war
with the general facts of the case.    There is no pretence that his
drinking (however extensive it may have been) incapacitated

him for business, or prevented him from attending to or controlling his business affairs. It indisputably appears that his business operations went on as actively as ever, under his direction; and no matter relating to his affairs, North or South, however slight, anybody ventured to touch without his personal authority. Those who speak most unfavorably of his habits represent him as constantly exercising memory, will, discrimination, firmness, and all the attributes of perfect intelligence. The habit of drinking undoubtedly grew on him as he sank under his complicated ailments; but down to his departure for Virginia, some two months before his death, nobody pretends that he was imbecile. Indeed, the evidence distinctly indicates that up to this time he retained nearly his full strength of intellect.

The will, then, is not impeachable on the ground of testamentary incapacity. There is no room to doubt that when it was executed the testator was fully competent.

Bodily disease may have abated some of the former elasticity of his mind; but it was in no way *diseased*, or even in an incipient state of decay.

2. There being capacity, was the will the free act of the deceased; or was it the result of undue influence, exercised by his brother, the principal beneficiary?

This latter question was not argued with any apparent confidence by the Appellant's counsel, and I cannot well see how it could have been. Undue influence must be an influence exercised by coercion, imposition, or fraud. It must not be such as arises from the influence of gratitude, affection, or esteem; but it must be the ascendency of another will over that of the testator, whose faculties have been so impaired as to subject him to the controlling influence of force, imposition, or fraud (Gardiner *v.* Gardiner, 34 N. Y. 162; Dean *v.* Negley, 41 Penn. R. 312; Small *v.* Small, 4 Greenl. 220; Trumbull *v.* Gibbons, 2 Zabriskie's N. J. R. 117). Moreover, the exertion of the influence upon the very act must be proved, and it will not be inferred from opportunity or interest (Carroll *v.* Norton, 3 Bradford, 320; Clapp *v.* Fullerton, 34 N. Y. R. 199).

I can discover nothing in the record that brings the case within the rules. The circumstances anterior to and attending the execution of the instrument are not consistent with any other hypothesis than that it was the product of the deceased's own will, and not of the force, fraud, or undue influence of any other. The fact is unquestioned that he was a man of more than ordinary vigor of intellect, of great firmness, self-reliance, and tenacity of purpose; and it is clear, from the evidence, that he retained his unusual powers of mind down to the period of making the will. He was not, therefore, in a condition to be exposed to undue influence. But the case is barren of evidence of any direct influence (much less that improper influence which will vitiate a testamentary act) exercised by the brother to procure the will. It may be that the deceased was unjust to his son, the Appellant, in the disposition of his property, and that the brother should not have been selected as the chief beneficiary; but there is nothing rising to the dignity of proof of any undue influence or connivance, on the part of the latter, to effect the result. In its disposition, as to the parts affecting the son and the brother, the instrument was similar to one made by the testator at Rossville, the fall previously, except that the annuity to the son was reduced from $1,400 to $700. It is possible that the brother knew what this will of 1858 contained, but there is nothing to base a conjecture upon that he interfered in any way to bring it about.

As to the will in question, the proof is equally decisive as to non-interference on the part of the brother. It appears conclusively that the alteration of the will, in 1859, by halving the son's annuity, was in accordance with the design of the testator, conceived in Virginia the winter previously—a design and result over which the brother could have had no possible influence in the nature of the case.

The instrument was drawn in the room of the deceased, he being alone with Mr. Clark, his counsel. The instrument proceeded solely from him. The brother was not present at any time during the two hours spent in the act. He knew that the testator was making his will, as did the testator's sister, Mrs.

Opinion by WRIGHT, J.

Guyon, who was in the house at the time; but that he was any more cognizant of the contents of the instrument being executed than the sister, there is not the slightest proof. True, the factum was at his house, but that was the deceased's only home and resort at the North. There was some evidence, also, that he conveyed the message to Mr. Clark to come and draw the will; but his agency in respect to that message was not only natural, but affirmatively shown to have been in obedience to the wish of the deceased, conceived in Virginia, before starting for the North.

In view of this state of facts, there is no ground for alleging that the deceased, in publishing the instrument, and dictating its contents, was not acting of his own free, uninfluenced will and wish.

There is much evidence in the case of matters transpiring at Rossville, subsequent to the will.

An allusion to it is unimportant. The point of inquiry as to testamentary capacity, and the exercise of undue influence or fraud, is before, or at the time of the factum.

Subsequent occurrences cannot affect the legal aspects of the case.

I am of the opinion that the questions of fact involved were rightly discussed by the Surrogate, and that the judgment should be affirmed.

Judges PORTER, HUNT, PARKER, and GROVER were also for affirmance. DAVIES, Ch.J., read an opinion for reversal, in which BOCKES, J., concurred.

Judgment affirmed.

<div align="right">

JOEL TIFFANY,

State Reporter.