HARPER v. HARPER, appellant.

*Will — witness to — evidence of testamentary capacity.*

One named as executor in a will may be a witness before the surrogate on its probate.

One, to whom a legacy is left thereby, may also be a witness.

The testator's correspondence, his manner of conducting business, and the character of the will itself, held to be stronger evidence of the testator's capacity than the opinions of experts.

THIS is an appeal from the decision of the surrogate of Delaware county, admitting to probate the last will and testament of William Parker, deceased, which decision or decree was entered on the 31st day of July, 1871.

The will bears date December 28, 1869. The testator died August 2, 1870, leaving no lawful issue or widow surviving him; but left three brothers, James Parker, Samuel and Benjamin Parker, and five sisters, Elizabeth P. Harper, Jane and Sarah Parker, Mary Dunshee and Harriet Erskine; also, one nephew, son of Fanny Harper, a deceased sister. The estate, real and personal, amounted to about $8,000.

Elizabeth P. Harper, sister of deceased, alone contested the probate of the alleged will before the surrogate upon the ground, first, that at the time it was executed the deceased was not of sound mind and memory, and was not competent to make a last will and testament; and, second, that the will was not properly executed and attested.

*Gilbert & Maynard,* for appellant.

*W. Gleason,* for respondent.

P. POTTER, J. Upon the question of the capacity of the testator, it became necessary for this court to review the whole evidence in the case, such a review being in the nature of a rehearing in equity. The rule in such cases is, that if the facts established by legal and competent evidence are sufficient to uphold the decision or decree of the surrogate, it will not be reversed if substantial justice appears to have been done, even though technically evidence has been improperly admitted or rejected by the surrogate; and unless it can be shown, or is clearly seen, that the rulings in that regard has done, or might have done, injustice to the party moving the review.

It appears from the case that the testator, at the time of his decease, was but about sixty years of age; had been known as a man of fair, ordinary intelligence, fully equal to the average of men engaged in the pursuit of farming. He was a correct business man; a man of strong religious views; filled the offices of trustee in the church, and was clerk of the sessions; and was director and clerk of a turnpike company. He was a regular attendant of church, and performed well the duties of the offices he held, and in the keeping

of accounts. The will, in form, is a reasonable and sensible instrument. It divides his estate among his near relatives, with much more than ordinary equality, in cases where wills are made, and strongly assimilates in its disposition to the provisions of the statute in cases of intestacy. The will contains sixteen clauses. The first clause is merely the appointment of his executors, and the conferring of authority upon them to dispose of his estate.

The thirteen following clauses (except the tenth and eleventh) are specific small bequests of clothing or articles of household goods, divided among near relatives and friends, in a manner evincing the exercise of thought, discretion, judgment and affection. The tenth clause is a bequest to his nephew and namesake, William Parker Dunshee, of stock in the Charlotte turnpike company of the nominal value of $300, and a sword and belt worn by his grandfather, Samuel, in the war of 1812.

The eleventh clause is a bequest to his nephew, William Henry Harper, one of the executors named in his will, of one hundred dollars. The sixteenth clause is merely directory to his executors as to the time of making distribution of his estate.

The fifteenth clause, which is the residuary clause, divides the rest of the estate as follows:

"15th. The residue of my estate to be divided into (8) *eight* equal parts, and distributed as follows: One part, or one-eighth each, to each of my brothers, James, Samuel and Benjamin, and one part, or one-eighth each, to each of my sisters, Jane Parker, Mary, the wife of Henry W. Dunshee, Harriet, the wife of John Erskine, and Sarah Parker, and the remaining one-eighth part to be safely invested by my executors (or the survivor of them), and the interest arising therefrom is to be paid semi-annually to my sister, Elizabeth P. Harper, and upon her demise they are to dispose of this said one-eighth part as follows: Out of it they will give to James Henry Harper, son of my sister Fanny, one hundred ($100) dollars, and the balance of this one-eighth is to be divided into six (6) equal parts. Five (5) parts of which I give in trust to the session of the United Presbyterian Church of North Kortright, and their successors, the interest to be appropriated by them annually for the promotion of the kingdom of our Lord and Saviour Jesus Christ in the world, either in the cause of foreign or domestic missions, as they shall judge most conducive to the good of souls; and the remaining one part, or one-sixth, my executors will appropriate toward pro-

viding suitable grave-stones for myself and wife, and to the keeping of our graves in good order."

The only inequality between the brothers and sisters is this: that while an estate in fee, or the whole estate in one-eighth, is given to each of the other seven of the brothers and sisters, but a life estate is given to his sister, Elizabeth P. Harper, in the other one-eighth of this residue, though one hundred dollars therefrom is given absolutely to her son, James Henry Harper, who is a witness to the will.

It is therefore seen, not only in the form, but in the provisions of the will; in the recollection of his various relatives, to whom kind and affectionate remembrances are provided; in the equal division of his estate into shares corresponding to the numbers of brothers and sisters, the will, speaking for itself, bears strong evidence of a mind exercised by sound reason, and by a discreet and discriminating judgment, with power to calculate and a mind directed by the spirit of justice and equity. Other grounds must, therefore, be shown to defeat the will, than its form or provisions. It is this sister, Elizabeth P. Harper, to whom but a life estate is given, that contests the probate of the will. As an heir at law of the testator Mrs. Harper would have inherited the equal undivided one-eighth absolutely.

It is claimed by the appellant, that when the said will, or paper purporting to be such, was made and acknowledged, the said William Parker was not of sound mind and memory, but that, on the contrary, he was of unsound mind, weak, demented, imbecile and insane.

It may well be conceded, that, though a will may in its form and features, and in the apparent wisdom and justice of its provisions, carry the impress of being dictated by wisdom, and by the exercise of a sound mind; yet, if in fact it be true, that its maker did not at the time possess a sound mind; if he was insane; if by reason of weakness or imbecility he was, what, in law, is known as *non compos mentis*, the instrument, so called a will, would be without legal effect. This, then, was one of the leading issues in the case, and has been found by the surrogate on the side of capacity and soundness of mind sufficient to make a valid will; and this is mainly a question of fact to be determined by the testimony of witnesses by the surrogate, and may be reviewed by this court. *Gardiner* v. *Gardiner*, 34 N. Y. 155. On such review, if it is found that opinions of testamentary capacity are given both ways, or stand in conflict, unless the preponderance is strongly against the finding of the surrogate,

the great advantage possessed by him of a personal inspection of the witnesses, and the opportunity of witnessing their manner of testifying, give to that officer such peculiar advantages and opportunities of weighing testimony over that of the reviewing court, that a reversal of his judgment will be rarely ordered; for it is now the established law of this State, that the legal presumption, to begin with, is, that every man is *compos mentis,* and the burden of proof that he is *non compos mentis* rests on the party who alleges that unnatural condition of mind existing in the testator. *Delafield* v. *Parish,* 25 N. Y. 9. But it is also the rule, that, in the first instance, the party propounding the will must prove the mental capacity of the testator. I have examined, with some care, the evidence given upon these issues. It would be impracticable, as it would be tedious, to make a complete analysis or abstract of the evidence on either side. If this should be done, still we must draw the conclusion as to which side is the preponderance. Briefly, then, in my opinion the weight of evidence is upon the side of the proponents, as found by the surrogate.

Up to the period of July 25, 1867, no question as to the capacity of the testator arises. At that time he had what was supposed to be a sun-stroke, which affected him in a degree, and at certain times more seriously than at others. When most seriously affected it rendered it difficult for him to express his wishes, and sometimes to articulate distinctly; but from the time of the said sun-stroke, until June, 1870, about six months subsequent to the date of the will in question, he kept regular book accounts, of dealings and transactions with a large number of persons, in the forms of debtor and creditor, with balances and settlements entered, with more than ordinary regularity, skill and accuracy, evincing judgment and capacity to understand and transact business. So, too, there was introduced as evidence of his capacity letters of correspondence from him, addressed to various of his relatives and friends, commencing on the 30th July, 1867, three days after the sun-stroke, and down to February, 1870, two months after the date of the will. All these letters bear evidence of a sound, discriminating mind, competent to give historical details of matters of domestic family interest, and with details of mathematical calculation and intelligent information, which only a sound mind could perform. These evidences, to my mind, are more reliable than speculations and opinions of witnesses, inexpert and incompetent to express opinions gener-

ally, from short and occasional interviews, had at times not always the best for determining the testamentary capacity of the testator. It is true that the witnesses to the will who, by law, are permitted, from the nature and necessity of the case, to express opinions as to the testator's capacity to make a will, failed to sustain the proponents' first issue, yet the proponents are not, in law, limited in that respect to those witnesses. Witnesses to a will are often called from a class of persons, not experts, not competent to express opinions of capacity. Except for the reason that they occupy that position, and are thus by law allowed to give opinions (which is an exception to the general rule), they would not be allowed. When the opinions of such witnesses are given, if in favor of the testator's capacity, though it is *prima facie* sufficient, in the first instance it is not conclusive; so neither on the other hand, if their testimony fails to prove testamentary capacity in the testator, is the proponent concluded thereby. Their testimony, like other witnesses, is to be weighed by considerations of interest affecting it, as well as by their incompetency to express opinions as experts. Testamentary capacity may be otherwise proved, and may be established against their opinions. In this case strong opinions were given by witnesses not experts, of incapacity of the testator, and in this respect there was great conflict, and of this character of opinions, perhaps, a preponderance was against his capacity; certain it is, there was strong conflict, but the correspondence of the testator, which was produced, and the will itself, with its reasonable, logical and systematic provisions, was much stronger evidence of capacity than any possible theoretical, inexpert opinions, based upon particular acts or sayings of the testator seen or heard by parties at occasional interviews during the same period, and perhaps at the most unfavorable moments of acute suffering of the testator from a painful illness, affecting in degree, at such times, the strength of his mind. This correspondence and this will demonstrated that the testator possessed a sound mind and was fully competent to reason, to calculate, to judge, and wisely to dispose of his estate. The conversation of the testator with his brother-in-law, Henry W. Dunshee, who drew the will at the time it was prepared, I believe, and the memoranda furnished, made by the testator, prepared by himself and in his own handwriting, enumerating the intended beneficiaries of small gifts, and the articles to be given; the evidence of correct memory of names and relationship; the special reason and propriety of the

gift; the equality of distribution of the bulk and residue of his estate among his brothers and sisters, with but a single exception and the reason given for the exception. have satisfied my mind with the correctness of the surrogate's conclusion upon the question of the testator's capacity, notwithstanding it was urged that such conclusion was against the opinion of medical experts.

From a careful examination of the testimony of the two medical experts, I am unable to find that it results in an opinion of incapacity to make a will, but the contrary. Dr. Norwood, the family physician, who only saw him at intervals of three or four months, states his disease to have been chronic meningitis — a chronic inflamation of the covering of the brain, causing him pain and heat about the system, and loss of the faculty of thought; this followed and was the result of the sun stroke. At times it was acute, as when he had been overworking with his head down, splitting wood, or work of that character. By giving him time and having patience with him at the intervals, he could do business. Witness did business with him requiring the counting of money and the giving and passing of receipts. "At these intervals I think he was competent to transact business, with no one to bother him, if it was not very complicated."

After stating that his case was incurable, he says: "I did not regard his mind as entirely sound. His mental state was that of dementia. That is a species of insanity. The characteristics of this mental condition are the loss of power of thought. In the acute stages, total loss; in the chronic, partial loss." "In such cases, all the faculties of the mind are more or less deadened. As distinguished from other forms of insanity, the mind is more passive." To the direct question, "What, in your opinion, about December, 1869, was his mental ability to make a final disposition of an estate of the value of $8,000 among some fifteen persons without assistance?" Ans. "If it did not require much figuring, I think he might do it to give him time. If it did require much figuring, he would be incapable to do it without assistance. I am speaking of times when he was in his ordinary condition after he was taken sick, and not of the times when he was worse. At such times he was entirely incapable of transacting business." The cause of his death was inflammation of the lungs.

Again, "I do not think there was any organic affection of the brain; what there was, was sympathetic. In the acute forms of this disease the patient is in a state of total dementia. Dementia is

a total loss of the faculty of the power of thought. In the chronic form there is partial dementia. At times he appeared to be rational, as far as he could go, and calculate. In cases of dementia the thought they do have is rational, as far as they can think. Dementia is something more than a mere weakening of the mind ; it is the loss of the power of thought, unsound mind. By unsound mind, I understand, all forms of insanity may be included, no matter how weak the intellect; still the man is of sound mind, if it is mere weakness. *This disease had no other effect upon the mind of Mr. Parker, excepting producing loss of power of thought.* This is all that is important in the testimony of this witness. The distinctions are not quite clear to my mind, between "dementia" and "partial dementia," upon the question of soundness of mind. But accepting this opinion as sound, as I understand it, that there may be sound mind in cases of partial dementia, then the case is brought back to the question, Was the testator at the time of making his will, in the language of the law, *compos mentis ?*

There is certainly nothing in this medical opinion to overthrow the conclusion of the surrogate, upon the legal rules adopted by the courts as the criterion. The subject has lately undergone thorough examination in the highest courts, of all the cases, the summary of all of which is this: "If the testator has sufficient capacity to comprehend perfectly the condition of his property, his relations to the persons who were, or should, or might have been the objects of his bounty, and the scope and bearing of the provisions of his will," he is competent to make a will. *Delafield* v. *Parish,* 25 N. Y. 9, and cases cited.

Another medical witness was called on the trial by the contestants, Dr. Hubbell, with less personal opportunities to form an opinion, and whose opinion was mainly formed upon the statements of Dr. Norwood. There was no essential disagreement between them. Indeed I think the opinion of Dr. Hubbell was more favorable to the proponents than that of Dr. Norwood. He said: "A man may have meningitis, and may be rational. I think the majority would be." Also, "A man may have acute meningitis, so as to be insensible, without the organic substance of the brain being diseased." "He may have chronic meningitis of long duration, without the brain tissue being affected." "As a general rule, persons with chronic meningitis are capable of transacting some kinds of business at times. When a person cannot transact business in this state, it is for want of concentration of thought as one reason. If a person

has sufficient concentration of thought to do business, he is likely to do it intelligently. If the person had concentration of thought sufficient to make the will described, I think it would be done intelligently." I have dwelt at length upon this point of capacity of the testator, because it seemed to be the great point upon which the contestants relied, and taking the rule on this point to be, as I understand it, that the competency of the mind must be judged of by the nature of the act done, in view of all the circumstances of the case, I think the surrogate arrived at the right conclusion upon this point. It is a sensible will, sensibly made.

But the contestants have raised several legal objections to this probate, arising upon the trial before the surrogate, that demand our consideration.

The first objection taken is, that James H. Harper, a subscribing witness to the will, and who is also a legatee to the amount of one hundred dollars, was an incompetent witness to its execution, and to conversations at the time with the testator. This objection is not very clearly presented—at all events, its force is not seen. The objection to his being a legatee and witness is cured by a provision of the Revised Statutes, volume 2, chapter 6, page 65, section 45 (50), which declares that he shall be a competent witness and compellable to testify, and the will shall only be so far affected as to make void the legacy to such witness. This statute made him a competent witness to a will. Another branch of the objection, viz. : "That the witness is an heir at law of the deceased, and that the evidence offered is improper, because it proves a transaction and conversation between deceased and witness, as against the contestant, who is an heir at law of the deceased," is not only confused as a proposition, but is untrue, in part, as matter of fact. The witness is a son of the contestant, who is still living. He is not, therefore, an heir at law of the deceased. If this signature of the witness James H. Harper, to the will, was a transaction between the testator and himself, the proof of that fact by himself, to which he made no objection on his own behalf, did not do any injury to the appellant. She was in no wise legally injured thereby. His signature had been previously proved, which was all sufficient to make good probate. But, though interested in the will, which does not disqualify, he was not then a party to the action, neither a proponent or contestant, nor a person from, through or under whom any party or interested person, derived any interest or title—if interested in the

event by reason of his legacy, he may still be a witness, and he is in no condition to raise the objection, he was not a contestant, and is not here as a party appellant. Besides, it is a rule, on review of decrees of surrogates, which are in the nature of a rehearing in equity, not to reverse the decree on the ground of the admission of evidence, technically improper, if the facts established by legal and competent evidence are sufficient to uphold it. *Clapp* v. *Fullerton*, 34 N. Y. 190 ; *Schenck* v. *Dart*, 22 id. 420. The old common-law disqualifications on the ground of interest, as well as that of being a subscribing witness, are changed by statute.

The same objection, in substance, as is taken to the witness Harper, is taken to the witness Henry W. Dunshee (except that the latter was not a subscribing witness to the will), that he was a legatee of a set of commentaries of the estimated value of $5.00. In my view I cannot distinguish this objection from that in the case of Harper (except as above). He was duly cited before the surrogate as a party entitled to notice of probate. He did not become a party there, either as proponent or contestant. He is not a party on this appeal. His only interest in the case was his legacy. He had not accepted that, he could not accept it before probate. Before probate he divested himself of that intent by release, not only but took an indemnity which neutralized all interest, so that he was competent at common law. If he was then disqualified, it was by reason of some statute provision. But if there is a legal technical error in admitting him to testify, I think the probate should still be upheld upon the authorities above cited, and his right to disclaim as settled in *Burritt* v. *Silliman*, 13 N. Y. 93.

The only other objection that is seriously urged is, that Alexander C. Leal, one of the executors in the will, was admitted as a witness. He is not a legatee, but a party. The authority relied upon to sustain this objection, is *Burritt* v. *Silliman*, *supra*. That case, in the court of appeals, does not decide the point, though it was discussed. It was held as claimed, at the circuit, and affirmed at general term, but was reversed on other grounds in the court of appeals. The case, however, was tried before the change in the statute allowing parties in surrogate's courts to be witnesses. Upon the whole case, I think the decree was right and should be affirmed with costs, of the parties on this appeal, to be paid out of the estate.

MILLER, P. J., and PARKER, J., concurred.

*Decree affirmed with costs of appeal to be paid out of the estate.*