## ROLLWAGEN V. ROLLWAGEN.

*Evidence — when opinions not admissible — exclusion, on cross-examination, of evidence proper on direct — presumption in favor of official act — on probate of will — execution of will — witness interested in establishing will — of genuineness of signature — of particular facts — admissions — Statutory construction — 2 R. S. 66, § 57 — Undue influence — presumption of — Will — testamentary capacity — fraud in execution.*

With the exception of matters of science, art, skill, trade, navigation, value, and other similar inquiries, witnesses are confined in their statements to the facts observed and known by them, as distinguished from their opinions and conclusions.    Accordingly, where upon the proof of a will witnesses were asked what construction they placed upon certain motions of the decedent, and the meaning of certain sounds uttered by him, *held,* that the testimony was inadmissible.

Evidence was excluded on the ground that it could not properly be admitted on cross-examination, but with an intimation that it might be introduced by the parties offering it as a part of their own case.    *Held,* that it was their own fault if pertinent evidence was excluded under such ruling and they could take no advantage of its exclusion.

Under the phraseology of 2 R. S. 66, § 57, the presumption is in favor of the accuracy of the decree of the surrogate upon proceedings for probate of a will ; and it must affirmatively appear that it was inaccurately made in order to justify its reversal and the direction of an issue.

Where the evidence given left the question whether a will was subscribed by the decedent alone or with the aid of some one in a state of uncertainty, and no evidence was given that the decedent requested or desired any other person to subscribe it for him, or to aid him in doing it himself ; *held,* that it was not executed in conformity to what the statute requires.

Where a witness who testified upon proceedings upon the probate of a will would secure, under the will, the supervision and control of the decedent's property ; *held,* that that, of itself, was sufficient to justify a close scrutiny of his statements, and reasonably induce the court, before which his evidence was given, to reject it as unreliable if it was deemed too improbable for adoption.

Instruments containing the genuine signature of the decedent, *held,* admissible upon the question of the genuineness of the signature to the will.

Evidence, that the decedent upon various occasions, when addressed by witnesses, did utter vocal sounds of an unintelligible character, showing that he would have spoken if he could, *held,* to be, in the nature of positive proof, that he had lost the power of speech.

A witness testified that the proponent of a will had admitted that the decedent had made a will carrying out certain designs the decedent was shown to have had, which was materially different from the will proposed.    This was

not contradicted by the proponent. *Held,* that the surrogate was at liberty to accept and act upon the admission as the truth.

Where an instrument produced for probate, showed that a change from the intention of the decedent had been made, and it appeared that at the time it was executed the testator was so enfeebled as to be incapable of detecting the change, from the mere reading of the instrument in his hearing, which was the only possible means he had for information on the subject; *held,* that no matter by whose agency the change was effected it was a fraud; and one of so material a character as to exclude the instrument from probate.

Where it appeared that the wife of decedent exercised a very great control over his actions; that she would not allow his children by a former wife, or grandchildren, to be with him in his last sickness, except when she was present, and declined to have them sent for when he was about to die; and a will which changed the disposition of property made by a former will wholly for the benefit of his wife, was proposed for probate by her, which will was made under her direction and procurement; *held,* that even if the decedent comprehended and assented to the changes made, the presumption would be that they resulted from her influence unduly and improperly exercised over him.

APPEAL by Magdalena Rollwagen, from a decree of the surrogate's court of the county of New York, denying probate of instruments claimed to be the will and codicil of Frederick Rollwagen, deceased. The facts are fully set forth in the opinion.

*Arnoux, Ritch & Woodford,* for appellant. The will in question was duly executed according to the requirements of the Revised Statutes of the State of New York. First. As to the subscription of the will by the testator. *Meehan* v. *Rourke,* 2 Bradf. 385; *Butler* v. *Benson,* 1 Barb. 533; *Ross.* v. *Chester,* 1 Hagg. Ecc, 227; *Reynolds* v. *Root,* 62 Barb. 251; *Nelson* v. *McGiffert,* 3 Barb. Ch. 158; *Jauncey* v. *Thorne,* 2 id. 41; *Weir* v. *Fitzgerald,* 2 Bradf. 42: Second. As to the acknowledgment of the execution of the will. *Hunn* v. *Case,* 1 Redf. 307; *Doe* v. *Roe,* 2 Barb. 202; *Barry* v. *Butlin,* 1 Curt. 639; *Moore* v. *Moore,* 2 Bradf. 261; *Chaffee* v. *Baptist Miss. Con.,* 10 Paige, 90; *Seaman's F. Soc.* v. *Hopper,* 33 N. Y. 633; *Vaughan* v. *Burford,* 3 Bradf. 78; *Tunison* v. *Tunison,* 4 id. 138; *Whitbeck* v. *Patterson,* 10 Barb. 608; *Boyd* v. *Cook,* 3 Leigh, 32; *Barton* v. *Robins,* 3 Phillimore, 455, note b; *Brown* v. *De Selding,* 4 Sandf. 15; *Peck* v. *Cary,* 27 N. Y. 9; *Newhouse* v. *Godwin,* 17 Barb. 240; *Smith* v. *Smith,* 2 Lans. 266; *Martin* v. *Wotton,* 1 Phill. Ecc. 131; *Ross* v. *Chester,* 1 Hagg. Ecc. 227; *Hunn* v. *Case,* 1 Redf. 307; *Gilman* v. *Gilman,* id. 355;

*Moore* v. *Moore,* 2 Bradf. 261; *Hutchings* v. *Cochrane,* id. 299–301; *Vaughan* v. *Burford,* 3 id. 78; *Whitbeck* v. *Patterson,* 10 Barb. 608; *Lewis* v. *Lewis,* 11 N. Y. 220; *Coffin* v. *Coffin,* 23 id. 15; *Van Hooser* v. *Van Hooser,* 1 Redf. 370; *Seaman's F. Soc.* v. *Hopper,* 33 N. Y. 633. At the time of the execution of the will and codicil, the testator was possessed of disposing mind, memory and understanding, and was competent to execute a valid last will and testament. First. As respects the physical condition of the testator. *Browne* v. *Molliston,* 3 Whart. 135; *Delafield* v. *Parish,* 25 N. Y. 38; *Van Alst* v. *Hunter,* 5 Johns. Ch. 158; *Williams* v. *Goude,* 1 Hagg. Ecc. 581; *Thompson* v. *Quimby,* 2 Bradf. 487; *M'Daniels Will,* 2 J. J. Marsh. 331; *Irish* v. *Smith,* 8 S. & R. 573; *Tyson* v. *Tyson,* 37 Md. 567; *Brown* v. *Torrey,* 24 Barb. 583; *Harrison* v. *Rowan,* referred to in 2 Green's Ch. (N. J.) 570; *Hall* v. *Hall,* 18 Ga. 41; *Swinfen* v. *Swinfen,* 1 F. & F. 584; *Allen* v. *Public Adm'r,* 1 Bradf. 381; *In re Geale,* 3 Swabey & Tristram, 431; *Browne* v. *Molliston,* 3 Whart. 131; *Van Pelt* v. *Van Pelt,* 30 Barb. 134; *Longchamp* v. *Fish,* 5 Bos. & Pull. 415. Second. As to the mental condition of the testator, in general. *Stevenson* v. *Stevenson,* 33 Penn. 471; *Watson* v. *Donnelly,* 28 Barb. 655; *Banks* v. *Goodfellow,* 39 L. R., 5 Q. B. 549; *Delafield* v. *Parish,* 25 N. Y. 59; *Den* v. *Van Cleve,* 2 South. 660; *Reynolds* v. *Root,* 62 Barb. 251; *Williams* v. *Goude,* 1 Hagg. Ecc. 581; *Harrison* v. *Rowan, supra; McMasters* v. *Blair,* 29 Penn. 305; *Thompson* v. *Thompson,* 21 Barb. 114; *Kempsey* v. *McGinniss,* 21 Mich. 141; *Leech* v. *Leech,* 21 Penn. St. 68; *Stewart* v. *Lispenard,* 26 Wend. 255; *Blanchard* v. *Nestle,* 3 Denio, 37; *Clarke* v. *Sawyer,* 2 N. Y. 499; *Thompson* v. *Quimby,* 2 Bradf. 490; *Cartwright* v. *Cartwright,* 1 Phil. 90; *O'Neil* v. *Murray,* 4 Bradf. 311. As to his memory. General Acts. *Van Alst* v. *Hunter,* 5 Johns. Ch. 158; *Brown* v. *Torrey,* 24 Barb. 583; *Watson* v. *Donnelly,* 28 id. 655; *Den* v. *Van Cleve,* 2 South. 660; *Reynolds* v. *Root,* 62 Barb. 251; Former wills; *Maverick* v. *Reynolds,* 2 Bradf. 360. As to his continuance of purpose, and as to executing deeds and contracts. *Harrison* v. *Rowan, supra; Den* v. *Van Cleve,* 2 South. 660; *Kempsey* v. *McGinniss,* 21 Mich. 141; *In re Forman,* 54 Barb. 295; *Allen* v. *Public Adm'r,* 1 Bradf. 381. The will and codicil in question truly expressed the testator's intention in respect to the disposition of his property, and the same were neither procured through undue influence or any other unlawful

means. As to the necessity of a new will. *Williams* v. *Goude*, 1 Hagg. Ecc. 581. As to fraud. *Kinne* v. *Johnson*, 50 Barb. 70; *Small* v. *Small*, 4 Greenl. 223; *Tyler* v. *Gardiner*, 35 N. Y. 610; *Parfitt* v. *Lawless*, 21 Weekly Rep. 200; *Tyson* v. *Tyson*, 37 Md. 567; *Eadie* v. *Simmon*, 26 N. Y. 11; *Mountain* v. *Bennett*, 1 Cox, 355; 4 Burn's Ecc. Law, 70; *Miller* v. *Miller*, 3 Serg. & R. 269; *Browne* v. *Molliston*, 3 Whart. 135. As to the evidence of undue influence. *Harrel* v. *Harrel*, 1 Duv. 203; *Reynolds* v. *Root*, 62 Barb. 251; *Zimmerman* v. *Zimmerman*, 23 Penn. St. 378; *Remsen* v. *Brinckerhoff*, 26 Wend. 340; *Van Guysling* v. *Van Kuren*, 35 N. Y. 71; *Miller* v. *Miller*, 3 Serg. & Rawle, 269; *Longchamp* v. *Fish*, 5 Bos. & Pull. 415; *Watson* v. *Donnelly*, 28 Barb. 655; *Ross* v. *Chester*, 1 Hagg. Ecc. 227; *Bleecker* v. *Lynch*, 1 Bradf. 471; *Pool* v. *Pool*, 33 Ala. 145; *Rabb* v. *Graham*, 43 Ind. 9; *Moritz* v. *Brough*, 16 Serg. & R. 405; *Wilson* v. *Moran*, 3 Bradf. 185; *Leech* v. *Leech*, 4 Am. Law Journal, N. S., 179; *Small* v. *Small*, 4 Greenl. 223; *Mountain* v. *Bennett*, 1 Cox, 355; *Kinne* v. *Johnson*, 60 Barb. 70; *Weir* v. *Fitzgerald*, 2 Bradf. 67; *Bleecker* v. *Lynch*, 1 id. 471; *Rudy* v. *Ulrich*, 8 Am. 241. The contents of the will often tend to prove, in connection with other facts, the existence of undue influence. *Jackson* v. *Jackson*, 39 N. Y. 153; *Leaycraft* v. *Simmons*, 3 Bradf. 35; *Wilson* v. *Moran*, id. 180; *Wightman* v. *Stoddard*, id. 393; *Hutchings* v. *Cochrane*, 2 id. 303; *Clapp* v. *Fullerton*, 34 N. Y. 197; *Reynolds* v. *Root*, 62 Barb. 251; *Rabb* v. *Graham*, 43 Ind. 13; *Stevenson* v. *Stevenson*, 33 Penn. 472; *Banks* v. *Goodfellow*, 39 L. J. R. 237; *Allen* v. *Pub. Adm'r*, 1 Bradf. 386. As to the preparation of the will. *Van Guysling* v. *Van Kuren*, 35 N. Y. 71; *Miller* v. *Miller*, 3 Serg. & R. 269; *Watson* v. *Donnelly*, 28 Barb. 656; *Longchamp* v. *Fish*, 5 Bos. & Pull. 415; *Moritz* v. *Brough*, 16 Serg. & R. 405.

*Henry L. Clinton, George F. Langbein* and *Malcolm Campbell*, for respondents.

DANIELS, J. The decedent departed this life at the city of New York on the 11th of October, 1873, aged about sixty-six years, having accumulated an estate valued at from five to eight hundred thousand dollars.

He was a native of Alsace, then a German province of France, and emigrated to this country in 1829. He was thrice married. The

issue of the first marriage was three sons and one daughter. The latter died before her father, but the former, together with her seven children, survived him. These sons and grandchildren all contest the validity of the instruments propounded as the will and codicil of the decedent. He was last married to the appellant. That marriage was solemnized on the 19th of September, 1871. At that time he had become considerably shattered and enfeebled in his health, which continued to decline until the time of his decease.

During the life of his first wife and for a portion of that time the appellant, who was her niece, was employed as a domestic servant in the family. In 1869 she again entered the household of the decedent in the same capacity, afterward becoming his housekeeper and finally his wife. His second wife survived her marriage only about one year. She died in the year 1867. Shortly after his own decease, his last wife, the appellant, gave birth to a daughter, claimed by her to be the issue of her marriage with the decedent.

He was a person of but little education, having simply acquired the ability to write his name and read figures. But before 1860 he was of firm, robust health, and while he had the use and control of his mental faculties was a person of more than ordinary natural sagacity and judgment. During his life he drank freely and was not uncommonly in a state of intoxication. And that habit of indulging in the use of stimulants continued until very near the time of his decease.

After his last marriage his health seems to have declined more rapidly than it previously had, and it continued to do so without any substantial interruption until the time he died. Subsequent to that marriage, but at what particular time was not shown upon the hearing in the surrogate's court, he made a will drawn by Mr. Rosenstein, and called the Rosenstein will. And it was for the purpose of effecting certain changes in the disposition which that made of his property, and in the designation of an executor, that the will in controversy was drawn. That was done shortly before the 17th of June, 1873, when it was claimed to have been executed by the decedent. This will provided that his wife should have his dwelling in which they resided, known as number 312 East Ninth street, in the city of New York, with the furniture, carpets, beds, glassware, plate, paintings and household utensils contained in it, and one-third of his personal property. And in addition to that it provided further that she should have one-third of the rents

of his real estate during her natural life, payable by his executors in monthly payments. These devises and bequests were then declared to be in lieu of dower.

The residue of the personal estate was directed to be divided into four parts, one for each of his three sons and the remaining fourth for his daughters' children, to be invested in real estate mortgages, and paid over to them as they attained the age of twenty-one years. And a similar direction was given concerning the residue of the real estate, each son to receive his proportion in monthly payments, and the share of the grandchildren to be invested and paid to them as they attained the age of twenty-one years. In case either child or grandchild died without lawful issue, the share of the deceased person was directed to be divided between the survivors. The real estate was not to be sold until the youngest grandchild living at the decease of the decedent's wife, attained the age of twenty-one years. And the fee was then to vest in the issue of his own children, and the surviving children of his deceased daughter. The widow, her two brothers, Henry and George Herrmann and his son Frederic Rollwagen were nominated executrix and executors of the will. And power was conferred upon Henry Herrmann, one of the executors, to collect the rents of the real estate, and after paying taxes, water rates, assessments, repairs and three per cent commissions on the gross amount collected, to deposit the balance as designated by a majority of the executors. These are the substantial provisions contained in the instrument propounded as the decedent's will. But they were so far changed by what was claimed to have been a codicil executed on the 5th of September, 1873, as to give the widow four additional houses and lots in Avenue A in the city of New York, and to provide that after-born children of hers should share equally in his estate, with those specially named and provided for.

In the course of the hearing before the surrogate's court, various questions arose concerning the admission and exclusion of evidence which, it is urged in support of the appeal from the decree made, were erroneously decided. This evidence related chiefly to the constructions the witnesses mentioning them placed on motions made by and sounds proceeding from the decedent. Statements made that he "tried to talk." "He made the same movements to me, that he wanted me to read it; he made signs and told me he was sick; I knew when he meant yes; he raised one hand and gave her a sign; he

looked to her, and then he said to his wife, with this voice; it made him put a smile on his lips," and others of a similar nature, were stricken out of the testimony because they consisted of the expression of what the witnesses stating them inferred to be the fact from the motions and sounds made by the decedent. Witnesses were also asked whether Mr. Rollwagen indicated assent by his nod; whether the witness had become accustomed to the motions of his mouth and his tongue so as to be able to understand him; whether he knew the witness inquired of, every time he came to see him in 1871, 1872, and 1873; whether he knew another when he went into the room; whether he shook his head in the manner people generally do when they say no; whether he understood at the time referred to all that took place; whether the witness knew by his rolling his head and moving his eyes that he wanted something, and other inquiries of the same nature. The answers to these questions were excluded by the court because they would necessarily embody conclusions from facts and not the facts themselves. Proof was also offered and excluded to show that Mr. Rollwagen knew what a witness came for, and directed the payment of money to him in every instance; that he understood an arrangement which was made concerning a certain check; that he could articulate, so that the witness could understand what he said, and was able to convey to her his meaning; that he recognized another witness; whether it were possible for any person other than the testator to have signed his name to the will; that the attorney, in attending to the execution of wills, was careful to have them executed according to the statute.

In excluding the answers to these and similar inquiries, and in striking out the answers which the witnesses gave, the court expressly held that all the facts might be shown which it was supposed existed warranting the inferences and conclusions, so that the proponents were left at liberty to prove them for the purpose of securing the benefit of the conclusions which might properly be indicated by them. This was all that they could reasonably ask for. With the exception of matters of science, art, skill, trade, navigation, value and other similar inquiries, witnesses are confined in their statements to facts observed and known by them as distinguished from their opinions and conclusions. That is the general rule and it seems to have been properly applied by the court, during the hearing of this case. *Morehouse* v. *Mathews*, 2 N.

Rollwagen v. Rollwagen.

Y. 514; *Van Deusen* v. *Young*, 29 N. Y. 9; *Messner* v. *People*, 45 id. 1. It was not a mere technical application of the rule, but one which the nature of the controversy specially justified. For it was an important inquiry in the case whether the testator was either physically or mentally capable of forming or expressing any intelligible purpose. And in its investigation his actions and movements and the sounds proceeding from his mouth seemed to be the only means through which any rational conclusion could probably be reached upon that subject. The theory of the contestants was that the decedent could neither express his thoughts nor convey his meaning, if any were even entertained by him. And for the purpose of properly trying its correctness, they were entitled to have facts proven as distinguishable from the inferences and opinions the witnesses might be inclined to regard them as warranting.

The court also excluded certain inquiries as to whether the decedent appeared or acted rational. But that was not done because evidence of that description was inadmissible. The inquiries were made of the contestants' witnesses, examined for the purpose of proving facts, exhibiting the bodily and mental condition of the decedent. They did not fall within the province of a mere cross-examination. And they were objected to and excluded for that reason, but with a distinct intimation by the court that the proponents could recall and examine them on that subject when they should resume the case. The exclusion was made because the evidence offered was not at the time in the orderly course of the hearing; not because it was inadmissible. The proponents were in no sense injured by the ruling which was made, because they could secure all the advantages of the evidence offered by placing the witnesses again upon the stand when they resumed the case. It was in the end their own fault if pertinent evidence was excluded under these rulings. It was part of their case, and was not included within the limits of a mere cross-examination. *Phila. & Trenton R. R. Co.* v. *Stimpson*, 14 Pet. 448, 461; *Houghton* v. *Jones*, 1 Wall. 702.

Nothing has been presented upon the rulings made concerning the admission or exclusion of evidence which would justify a reversal of the decree. For that reason it will become necessary to examine the evidence which was given in order to determine whether the court was right in rejecting either the will or the codicil. And in making that examination and determining the

effect of the evidence the circumstance that the witnesses were personally before the surrogate, and observed as well as heard by him, must be allowed its appropriate weight. There is often very much in the manner, the appearance, the indications of feeling, as well as intelligence and acuteness of witnesses, which will aid the tribunal observing them in properly determining the credit due to their statements, and which cannot be exhibited by a mere return of what they may have sworn to. That advantage the surrogate had in the present case, and in the conflicts and contradictions which existed in the evidence it probably materially aided him in harmonizing and disposing of the different statements which were made by the witnesses.

The statute only authorizes this court to reverse the decree of the surrogate when it appears to have been erroneously made. 2 R. S. 66, § 57. The presumption under the phraseology made use of must be in favor of its accuracy. It cannot be conjectured to be otherwise, but that it was inaccurately made must affirmatively appear in order to justify its reversal and the direction of an issue. This is the plain meaning of the statute, and any other provision would be clearly unreasonable. This presumption must be overthrown if the decree cannot be maintained. And before that can be properly done, the conclusion of the surrogate, from all that was legitimately and lawfully before him in the case, must be found to have been erroneous. Among those subjects which he could, and no doubt did consider, contributing to the conclusion finally reached, was the circumstance already mentioned of the appearance, manner, intelligence and feelings of the witnesses produced and examined upon the hearing. *Delafield* v. *Parish*, 25 N. Y. 22.

The execution of the instruments propounded as the will and codicil of the decedent was attested in the usual form by the witnesses, the same persons acting in that capacity on each occasion. They were each examined on the hearing in the surrogate's court, and each in the first instance expressly, distinctly and positively testified to the execution of both instruments by the decedent, and the particular observance of all the formal statutory requisites to render them valid instruments. According to their direct evidence nothing was omitted essential to their formal accuracy, and the decedent performed all that could be expected from him understandingly, as well as unequivocally. But upon the cross-examination of two of them an entirely different state of things was made

Rollwagen v. Rollwagen.

to appear, while the other adhered to his original evidence throughout.

The attorney who drew the will and the physician who attended the decedent, two of the subscribing witnesses, finally stated that they did not say, certainly that no person held the hand of the decedent when his name was subscribed to the will and codicil. Before that, Bellesheim, the attorney, swore positively that he saw the decedent write his name with his right hand to both instruments, and that it took him a long time to write, writing his name to one as freely as he did to the other. But when he was asked whether he was certain anybody had hold of his arm or pen at the time he signed the codicil he answered that he thought not. Then he was asked whether he was certain that nobody did and his reply was, "No, I would not be certain about it." He then stated that his recollection was the same concerning the signing of the will as the codicil, and that his best recollection was that the decedent wrote the signatures to both without assistance.

The witness Goulden described these occurrences in about the same way. He said he looked at the decedent when he wrote his name to the will, but did not look exactly at his hand and did not see whether anybody held the pen. And he also said that the decedent signed the codicil, but when the question was propounded, "Were you looking at him when he signed it?" his answer was, "No, I did not." Then he swore that he looked at his fingers when he signed and they moved. That he looked one moment. He was then asked, "Did you see anybody hold the pen for him?" and answered, "That I don't remember." "You don't remember as to whether anybody held the pen?" to which he answered, "No, I don't remember." Upon his re-examination he was asked to explain in regard to the execution of the will, whether anybody held the pen or not, and his answer was, "that he signed it alone; that nobody held the pen for him to sign."

These answers given by both these witnesses are exceedingly important, for they leave the subscription of the will and codicil in at least a state of uncertainty, while the statute requires that the instruments should, to render them valid, be subscribed by the testator. 2 R. S. 63, § 35, subd. 1. And it only allows them to be admitted to probate and recorded when that fact shall appear upon the proof taken. Id. 58, § 14. If the proof does not establish the fact that he did subscribe the will and the codicil himself, then

Rollwagen v. Rollwagen.

they were not executed in conformity to what the statute has required, for no evidence whatever was given either showing or tending to show that he requested or desired any other person to subscribe them or either of them for him, or to aid him in doing it himself.

Very little reliance can be placed on the statements of these two witnesses, even if they were not inconsistent with the other evidence given upon the hearing. For they involve themselves upon the most material facts in direct and irreconcilable contradictions. They at first testified that the decedent on both occasions responded in words to questions put to him, but in the end acknowledged that no word whatever was spoken by him, and no sound was made by him beyond a guttural, inarticulate noise. They also swore positively that they saw him sign both instruments himself, and finally said that they could not tell whether he did it or whether his hand was held or guided by some other person ; Bellesheim concluding, " I would not be positive whether he was assisted in writing or not." A similar inconsistency appeared in their relation of what transpired concerning the reading of the will and codicil ; Bellesheim saying in the first instance that the decedent got Doctor Goulden to read the codicil over to him after it was read by himself ; that he, decedent, handed it to the doctor. And after the witness said he read the will to the decedent, the doctor read it over to him again before he signed it. He afterward stated that the decedent gave it to the doctor, and that he read it over, but not aloud. He further stated that the codicil was not read by any one but himself, during the time it was in his presence, in the presence of Mr. Rollwagen. And after that he stated that Goulden read the codicil, but he could not tell whether he read it aloud or read it to himself. Theiss said that the will was not read while he was there, but that the codicil was by Bellesheim, who then gave it to Goulden, and he read it aloud to Mr. Rollwagen, loud enough for any person to hear, while Goulden testified that he read the will aloud to Rollwagen so that he could understand him. He also stated that Rollwagen told him he wanted him to read the will to him, afterward that he only showed him the will, *held it before him* and showed him with his fingers that he should read it, then that he merely pushed it toward him, and that he did not touch the codicil, but simply made a motion with his right hand, which the witness thought meant that he should read the codicil, and that he then did read it

aloud. The decedent, he said, only moved his right hand and made a sound represented by the letters "ngy," "ngy," "ngy."

The other witness, Theiss, was more consistent, but still less reliable in his relation to what transpired on these occasions. He not only swore to audible responses in words by the decedent, but in addition to that, to the circumstance that he occasionally expressed himself in complete sentences. When that was done, according to his own statement, the other two witnesses were as conveniently situated as himself to hear what was said, and yet they unite in their final evidence in saying that not one word was articulated, by the decedent, in their presence on either occasion. He also testified that the decedent wrote his name " in a slowly way," but freely and without difficulty, and whispered freely and easily. Besides, he stated that the decedent requested the witnesses to sign as such, while, according to the others, he merely responded in answer to a question put to him on that subject by a nod and the expression of a guttural sound represented as they were variously impressed by it by the letters "n," "g" and "m." It is quite evident that no room for mistakes existed between himself and the other two witnesses on these subjects. Either he or they must have sworn falsely in the evidence given concerning them. And in their own evidence such striking contradictions appear upon important circumstances as plainly indicate that they were not only willing, but endeavored to create false impressions of what had actually transpired in their presence, and which they were specially called upon to witness. An untruthful and dishonest design was exhibited wholly incompatible with the existence of any thing like confidence in the statements which they made.

The unreliable nature of this evidence concerning the subscription of the instruments was rendered still more apparent by what previously transpired in the sale and conveyance of the place from which the decedent was moved when possession was taken of the new house. The contract and the deed executed for that purpose were drawn by the same attorney, Mr. Bellesheim, and he was present when they were subscribed. After the contract was read over he said that it was signed, he thought Mr. Rollwagen signed it. He was sitting in a chair and wrote on the table. That he signed easily and freely, and was a fluent writer and in good health, while he did not and could not remember whether his wife, who was present at the time, held the pen he was writing with or not. That

is the substance, though not the order of what he stated occurred at that time, which he thought was in June, 1873, the date of the contract.

This witness stated further that he was present when the deed was signed, which was given by way of performance a few days after the contract was made. He also said that Ohl, one of the grantees, and two other persons were present at the same time, and that Rollwagen was sitting when he signed the deed, but he did not see whether Mrs. Rollwagen or any one else held or guided the pen. This deed is in the case, and appears by its date and acknowledgment to have been executed on the 14th of June, 1873, which was three days prior to the date of the will.

It also appeared that a contract was made for the purchase of the new house on the 17th of April, 1873. Sackett, who negotiated the sale of it, was present when that contract was signed and signed it for his brother-in-law. He testified that Rollwagen sat in an arm-chair at the end of the table, and in signing the contract his wife put the pen in his hand; "he could not make any headway with signing it himself, and she took hold of his hand to guide his hand in signing it;" "she stood and guided his hand to sign the signature;" she made all the movements and he did not move his fingers without her assistance; when she put the pen in his hand the witness said that it did not remain in his fingers, and to the best of his recollection no movement was made except by her guiding his hand. And the witness Ohl said that the deed of the same house was signed substantially in the same way. He said the decedent's wife assisted him in signing; he saw her take hold of the pen at the time the signature was written, stating that he could not write himself because he was too nervous; on this occasion Bellesheim was present, and it was one of those referred to by him when he said he did not remember and did not notice whether the decedent's hand or pen was held by his wife at the time when his name was subscribed to the deed.

It appears from this circumstance that it was done in his presence when, if he was truthful, he did not observe it, and the same thing may have been done when the instruments propounded for probate were subscribed, even though the witnesses did not notice the decedent's wife about the room at the time. This deed and the contract, subscribed in a similar way, were made before either the

will or the codicil, and if the decedent could not write his name to the former, that circumstance affords good reason for believing that he was no better able to do so at the date of the latter. And that he could not subscribe the contract and deed was proved beyond controversy, for the evidence given as to the fact was not only uncontradicted, but Henry Herrmann, the appellant's brother, who was interested in sustaining the will because it provided him with lucrative employment, corroborated what had previously been said as to the signing of the contract. He said that the appellant assisted the decedent in signing it, but could not say how much he or she wrote.

The improbability of the decedent signing either of the instruments propounded for probate is further indicated by the circumstance that with one exception the checks drawn near the same time on his bank account, were signed by her writing his name upon them. That seems to have been done without even the intervention of his own hand, and in so clever a manner that they were paid by the bank officers, under the belief that the signature was in the genuine writing of Rollwagen. Some of these checks were for large amounts paid for work being performed through the agency and supervision of his wife in the erection of a new building. The exceptional instance mentioned consisted of a check of $17,800, drawn near the 1st of May, 1873, to pay for the house already referred to. That, according to Herrmann's evidence, was subscribed by Rollwagen, without assistance. But his evidence on that subject is liable to some suspicion on account of his interest in sustaining the will for the purpose of securing the supervision and control of the decedent's property, which that instrument provided for him. That of itself was sufficient to justify a close scrutiny of his statement and reasonably induce the court before which his evidence was given to reject it as unreliable, if it was deemed too improbable for adoption. *Elwood* v. *Western Union Tel. Co.*, 45 N. Y. 549.

In addition to that it appeared that this witness and the decedent's wife took him to the bank on which the check was drawn for the purpose of assuring the officers that it was right and should be paid, and while there such assurance seems to have been given, but without any thing being said or done by him that was intelligible to any other person than those by whose instrumentality he was taken there. And that occasion, according to the last witness, was the

first time he was out of doors with the decedent in the year 1873. There is certainly sufficient in this connection in his own evidence, to throw grave doubts upon the truth of the statement that this check was really subscribed by the decedent.

On the 4th and 21st of June, 1873, contracts were made for the masons' and carpenters' work of a new building. The first of these was with the witness Schaaf, who testified that he was present when it was executed, and that Rollwagen, although making the guttural sound mentioned by so many of the witnesses, expressed nothing that he could understand. This contract was subscribed with his name by Herrmann, under the supposition that authority for doing so was created by the inarticulate sound mentioned, accompanied by a nod of the decedent's head. The same thing occurred when the other contract was subscribed, except that Schwartz, the other party to the agreement, said that no noise accompanied the nod, in answer to the inquiry whether Herrmann should put the decedent's name to it. This witness, like the other, also stated that no word was spoken by him, and no intelligible sound proceeded from him. These statements were further sustained by the proponent's witness Boekell, who was the architect of the building, for he stated that when he asked decedent if he authorized Herrmann to sign his name to the contracts, he answered in the first instance by a nod and a hoarse kind of a sound, and in the other by nodding his head and moving his hand. These transactions are quite important in their bearing upon the ability of the decedent to write his name when the instruments presented for probate were made. For they show that in very important business affairs, where he probably would have subscribed his own name if he could have done so, that act was performed by other persons.

The witness Geissenheiner, who is referred to by both parties as a reputable, intelligent and reliable person, and who had been the decedent's counsel through the active portions of his life at least, testified that at one time when he called upon him which preceded the date of either of these instruments, he noticed that he had not the use of his arm or foot on the right side, and thinks he then said, "I cannot hold a pen." And then added that he said, "I cannot write, I cannot use my hand." That was as early as 1871, before he had lost the power of expressing himself by words. The witness Margaret Boese, who was called and examined by the proponents, gave evidence tending to establish the same fact. She was a

domestic in the family during the early portion of the year 1873, and last saw the decedent in June of that year. Upon her cross-examination she testified that the appellant, Mrs. Rollwagen, told her that he could not write, and also that he could not read. And there was no direct evidence given that he retained the ability even to write his name at the time when these controverted instruments were signed beyond that given by Herrman, who only said that he saw him sign the check on the 1st day of May when his wife was standing by his side, and by Theiss, the properly discredited witness to those instruments, nor none of a circumstantial nature in any respect reliable.

Besides the evidence direct and circumstantial that he could not write his name when either of the instruments offered for probate were made, the surrogate's court had before it documents bearing the genuine signatures of the decedent, from the appearance of which something might be inferred as to the nature of those appearing on the proposed will and codicil. Those documents were subscribed when the decedent could unquestionably write his name, one of them being subscribed at the time of his marriage to the appellant. They were in evidence for other purposes, and so far as their appearance affected the probability of the inquiry whether the signatures to the will and codicil were genuine they could be lawfully used for that purpose. *Ellis* v. *People*, 21 How. 356. In that respect the surrogate had evidence before him which may have been important and convincing in its character not produced before this court.

Evidence was given by the attesting witnesses concerning the publication of the instruments and the requests made to them to subscribe as such, of a similar nature to that relating to the signatures placed upon them. On the direct examination of Bellesheim, the attorney, he stated that he asked Rollwagen whether he executed the first instrument as his last will and testament, "and he said yes." That he then asked whether he wanted us to sign our names as witnesses to the will, and he said yes; and after the other instrument was signed he asked "whether he republished his will as his last will and testament, and he said yes." He stated that he asked him the same question as to the witnesses signing the codicil as such, but what reply was given, if any was made to that question, was not stated. Goulden, another witness, on his direct examination, testified that Mr. Rollwagen himself first applied to

him to become a witness; that he told him he had an intention to make a will; wanted him to be there and fix the time, and after he had signed he requested the witnesses to sign the will. He also swore that Rollwagen told him to call to witness the codicil; and when it was subscribed he said that Bellesheim asked if the decedent wanted them to sign, "and he said yes;" that Mr. Rollwagen " wanted us to sign the codicil." While on cross-examination Bellesheim said that the decedent did not utter a word on either occasion, but simply nodded and made a guttural sound in answer to the questions whether the instruments were his will and codicil, and whether he requested the witnesses to subscribe them. Goulden in the same way stated that it was Rollwagen's wife who asked him to call and witness the will ; that the decedent showed the witnesses the will by making a sign with his hand, but " he did not say any thing;" that he did not say one word on the subject of their witnessing the will; that he merely made the gesture described and " bowed a little," and then the witnesses signed the will, which was the last that was done. He gave about the same answers concerning the publication and witnessing of the other instrument. His statement was that Mrs. Rollwagen told him that Mr. Rollwagen wanted him to come two days after and sign the codicil that he wanted to make to his will. When that was subscribed the witness was asked, " Did anybody say any thing to Mr. Rollwagen on that occasion about any of you three signing the codicil, as witnesses?" His answer was, "I don't know;" and he added afterward that he had no recollection of it. He testified that Bellesheim asked if that was his codicil and he bowed his head, and then the witnesses signed it, and nothing in relation to it was said after that.

These direct and positive contradictions were certainly so discrediting in their nature that no error could arise out of the refusal to believe the witnesses making them. The other witness, Theiss, said that the deceased whispered the words, "I want you to sign my will," and he then signed and saw the others sign. He also stated that Bellesheim wanted him to sign the codicil, saying, " you have got to sign it, too." That he asked the decedent, " Is that your last will and testament;" that he whispered, "yes," and then the witnesses signed it. This witness, in general terms, adhered to these statements, except perhaps as to the will. He stated that " they told me it was a will; I signed my name; I did not hear any thing about the will, or any thing at all." But as to the fact and ability of the dece-

dent speaking, he did not waver in this respect, maintaining a position of direct hostility to the final statements of the other two witnesses. That he was wrong there seems scarcely room for doubt. For the other witnesses were as apparently anxious as himself to prove the facts necessary to sustain the instruments as a will and codicil, but finally failed to maintain what they at first asserted as the truth. They not only contradicted themselves but also contradicted him, as to the important circumstance of the decedent expressing himself by words. Other witnesses were sworn and examined on the part of the proponents, who did testify that the decedent expressed himself by words and made intelligible remarks up to near the time of his decease. But very great doubt was thrown upon the accuracy of their recollections in this respect by the testimony of other witnesses given concerning the same subject. As early as 1872, according to Rettinger, Ernst, Wagner, Bach and Bendinger, his power of utterance was not far from being exhausted. After a remark, by way of introduction, Rettinger heard nothing he could understand. Ernst said he spoke hoarsely and coarse. Wagner said he did not speak above a whisper. He though the decedent thanked him and replied " So." In answer to an inquiry made concerning the state of his health, but finally said he gave a nod of the head "and as much as I understood ' So.' " In 1872, Bach said, the decendent invited him to drink, but when he saw him in 1873 he merely shook his head by way of answer to his salutation and said something, he could not hear it whatever it was. Bendinger described his voice as hoarse in 1871, saying he could not speak except hard. Boese, the servant, stated that she understood him some in February, 1873, but not all, and that some of the time Mrs. Rollwagen told her what he said. Schultz saw him in the spring of the same year about estimating for a new building, but said he could not understand any thing he said except that he said yes by nodding. Hoch said he talked with him in April, 1873, but qualified his general answers by saying that Mrs. Rollwagen might have explained some answers and he had forgotten how much of them. The others were more confident, stating that he conversed with them in 1873, and repeated what they understood him to say. Ohl said he did not understand him much, only a few words, and throughout the conversation his wife told him what she claimed the decedent said. According to most of the other witnesses who related words and sentences, which

they said they remembered, they consisted of common place observations concerning trifling or unimportant affairs. They were subjects upon which he would not be very likely to try to express himself, where his utterances were attended with so much difficulty as the other witnesses of the proponent described. If, as it was stated, he could talk, it certainly is very strange indeed that he should not have expressed himself with the same ability and freedom at the times when the contracts were made for the sale of his former dwelling and the purchase of the other, or when the deed was executed on his behalf, or the contracts for mason and carpenter work were made for the house which was being erected, or when he attended at the bank on the 1st of May, for the purpose of having the $17,800 check paid, or at the meeting of the directors which he last attended, or during the five weeks the painter worked in the new house, or while Graham was engaged putting down the carpets, or Heynemann called for his monthly gas bills, or Geissenheiner saw him about shoring up his house, or when the instruments propounded as his will and codicil were executed.

Many of these transactions were exceedingly important and they seemed to appeal to him for an expression of his mind, if he really had any ideas relating to them, and yet not an intelligible word was spoken. He tried to speak and failed to do so. That was the case on many occasions mentioned by the witnesses, when transactions he was interested in were brought to his notice. Geissenheiner testified that in 1872 he could not get an answer from him beyond the sound represented by the letters "m," "m," "m." The last of March or the first of April, 1873, he called to see him in relation to a notice which had been served, requiring him to shore up one of his buildings, and all he could get by way of response was a mumbling noise represented by those letters. Stephan who had shaved him for years, and borrowed $500 from him, called to pay the interest, and finally the principal, but failed to obtain any intelligible answer from him. Moser, an old friend, could obtain no answer from him, though he seemed to try to say something. Scholls, Pfluger, Hahn, Moore, Stadler, Catharine Monninger, Werner Arnold and Whalan met with no better success. Koch lived in his building and saw him often in 1872–3, but could then secure no answer from him. Sackett had important business with him, but stated that he never heard him speak, and Anna M.

Browning, whose brother married his daughter, found him in the same condition.

These were not witnesses who failed to hear him speak simply, but they were either old friends and acquaintances with whom he had been accustomed to converse, or persons having business with him, concerning which he was interested to speak if he possessed the power of doing so, and yet not a word was utterred. by him in their presence either near to or after the time when these instruments were made. On very many of the occasions when he° was. addressed by them he did utter vocal sounds of an unintelligible character, showing that he would have spoken if he could. All this evidence was of the nature of positive proof that he had lost the power of speech, and was properly so considered by the surrogate. *Bradley* v. *Mutual Benefit Ins. Co.*, 45 N. Y. 422.

Some of the proponent's witnesses mentioned occasions of his speaking when other persons were present who positively contradicted the statements made. Among these were Mrs. Schmoll and Henry Herrmann. The latter stated that the decedent answered Tully, the physician who attended him, the questions asked from the 24th of September to the time of his death. But Tully testified that he examined his tongue and found one side of it paralyzed and that he was incapable of speaking for that reason. He added farther that his body was paralyzed upon one side, and he thought it was the right side. From the appearance he considered the disability one which had extended through a period of two or three years. He thought it an advanced case, and was informed by his wife that he had been first attacked about three years before. Heynemann stated that she informed him the same, and Geissenheiner testified that the decedent gave him the same information in 1872. Other evidence was given of his inability to shake hands with his right hand, and of his actual failure to do so by Challier, Pfluger, Feldheim, Heynemann, Moore, Anna M. Browning, and Werner, while Rettinger, Schmidt and some others testified that he did shake hands with them. It also appeared by the statements proven, which his wife had made, that he was unable to move himself in bed, that he could not control the calls of nature, and required to be fed like a young child. Other evidence was given confirmatory of the same condition, while the proponents gave evidence of the contrary. The preponderance, however, was decid-

edly with the contestants, and for that reason the surrogate was certainly right in adopting their theory of the case.

Challier who saw the decedent in 1873, testified that Mrs. Rollwagen told him that the decedent was not able to speak. Graham, who was fitting the carpets in the new house, stated that she told him that it was a stoppage of speech that he had. Anna M. Browning, who called to see him in July, 1873, said that his wife informed her that he could not say any thing.

Dr. Goulden did swear that he did not have paralysis and he probably did not so severely as to completely disable him, for some of the witnesses mentioned the fact that he did, on a few occasions, walk a few steps in the house and also seemed to drag his feet along while being assisted by others. The doctor was probably incorrect in his answer, because he himself said that he never examined his tongue to see whether it was affected by paralysis or not, and the other evidence appears to be entirely controlling on the subject. In view of all that was given, it is highly improbable that he could speak at all when this propounded will and codicil were made. For that reason it cannot be supposed that he, by words, requested the witnesses to witness either instrument or declared either to be his will. If he could have spoken he certainly would have done so on those occasions, and if he had the ability to speak then and did not, that would be a strong circumstance showing that he did not design to sanction what his wife and these witnesses were endeavoring to do in his name. That he nodded and made a guttural sound in answer to the questions whether he desired the witnesses to sign, and declared the instruments made to be his will and codicil, are altogether too uncertain evidences of assent to sustain documents of such importance, in view of the other evidence in the case rendering these acts at the most equivocal. That movement may have been sufficient in a general sense for the ordinary emergencies of his life, where mistake or misapprehension would result in no serious consequences. But to allow it to be the means of sustaining an important disposition of property by a will and codicil, would, under the circumstances appearing in this case, be dangerous in the extreme, for the reason that such a determination would be made without any reasonably sure foundation for its support. Cases are cited in the argument, and points of the proponent's counsel, in which testamentary dispositions of property have been maintained upon evidence of assent, conveyed by signs and motions. But they were not of that uncer-

tain and equivocal character that they appeared to be in this case. For that reason, those authorities cannot be accepted as controlling the present controversy, and there is nothing in them fairly justifying the extension of the principle maintained by them.

According to the testimony of Mr. Geissenheiner, who for many years had been the decedent's counsel, he was in the habit of nodding in conversation without limiting the movement to the expression of an assenting design, and sometimes even when a negative answer was given in words. He said that he had a habit of nodding when he spoke, whether he agreed or whether he differed. And that was sufficient to render the act one of doubtful signification, even though ordinarily he may have designed the expression of assent by means of it.

After he was deprived of the power of communicating such thoughts as he still might have by speech, he accompanied his nods by sounds of a variable character. When Stephan endeavored to talk with him upon one occasion, he represented the sounds the decedent made by the letters "m" "m" "m" "ghagh," "ghagh" "ghagh" with a movement of the head, showing a nod. Moser represents the sounds made in his presence by the letters "ghagh" combined and repeated several times. He said that the decedent nodded and made a sound. Feldheim testified that this inarticulate mode of expression commenced before the time when he was married, and when by watching, words might be distinguished and understood. The sounds he represented were still different from the others, being expressed by the combined letters "ngh" "ngh" "ngh" "ngh." Schaaf endeavored to converse with him on the 4th of June, 1873. He was the person who had the contract for the mason work of the building being erected, and to whom, for that reason, the decedent would be very naturally desirous of expressing himself if he could. But he said that the decedent merely nodded and made the sounds "ehu," "ehu," "ehu." And he afterward added that when any one spoke to him he most of the time made that sound followed by the sound "wehn," "wehn," "wehn." Heynemann, the collector of the monthly gas bill, said that after 1872 he made the sound "m," "m," "m," accompanied with a quivering movement of the lips. The sound Challier, the carpenter, heard was "pf," "pf," "pf," "pf." Stryker, who was cashier of the Murray Hill Bank and saw the decedent there at the directors'

meeting in February, 1872, stated that he nodded and made a side-wise movement of his head. He said that he would make such a motion and endeavor to speak, but he had no conversation with any one during the meeting. Moore stated that he moved his head while he was at the house in the latter part of 1872, and made a guttural sound expressed by the letters "hagh," "hagh," "hagh," "hagh." The sounds Stadler heard were "gh," "gh," "gh." When Graham saw him in May or June, 1873, he did not speak but moved his head from shoulder to shoulder. To Arnold he made a sort of gurgling noise. When the proponent's witness, Rettinger, saw him in November, 1872, he understood him to say, "how do you do" and heard another noise not expressed by words issuing from his throat. And Wagner, another witness called for the same parties, who saw him in January or February, 1872, stated that in answer to his salutation of "how do you do," he nodded his head and expressed the word "so." But that he said was not done distinctly, but so that he could understand it. The sounds made at the times when the propounded instruments were executed, have already been mentioned. And as various as they were, it was the decedent's habit almost invariably, to accompany the utterance of each with a nod or some other movement of the head. Why these sounds were made by him, cannot be ascertained from any direct evidence given on the hearing, and it is not probable that any could possibly have been obtained.

But as they were made by way of response when he was addressed, they must be evidence of ineffectual efforts to speak, and for that purpose to express thoughts he probably entertained, but could not utter, and if the differences in the sounds meant any thing, they must have been designed for different thoughts; and as such, would necessarily qualify the signification of the movement made by the head. No reasonably certain indication of unqualified assent could therefore be established by the nod. With one expression of sound it probably meant one thing, while with a different sound an entirely different thing. But what in either case was designed to be expressed by the combination no possible means exist for determining with any thing like reasonable certainty, and for that reason they would be unsafe and unreliable circumstances for the conclusion that the decedent intended, by means of them, to express his assent to either instrument propounded for probate,

or his desire that they should be witnessed by the persons in his presence as his will and codicil.

But if the decedent had actually subscribed the controverted instruments, and the formal requisites prescribed by the statute had been proven to have been observed, it is claimed by the contestants that they were still properly rejected by the surrogate on account of fraud and undue influence. These objections assume that if they were executed at all by the decedent, that act may have been designedly performed by him in each instance, but under the controlling influence of his wife, and in consequence of a fraudulent misrepresentation of the contents of one or both of them.

The evidence shows no serious disagreement between the decedent and his children or grandchildren, and no reason therefore why he should have been disposed to deprive them of his property. On the contrary, Mrs. Perry, who evidently marshaled her recollection for the benefit of his widow, stated that George and Louis were always respectful enough to their father. And he does not seem to have found fault with either Frederick or Louis, but he did not like their wives. He was disappointed in George, who married without his approbation, and afterward went to California without his assent, and did not prove industrious or thrifty as he had the right to expect he would from the advantages secured to him. But no such dissatisfaction was engendered between them as would be supposed to lead to any testamentary disposition of the father's property seriously prejudicial to their natural expectations; and from the circumstances under which he married the appellant, she had no uncommon claims upon his liberality. It is true, she gave him constant, kind and commendable care, attention and assistance. But the duty to observe and render that fairly arose out of the fact that she married an old, infirm man in decaying health, who could not probably survive that event but a few years at most. It was reasonably to be expected that such offices would be required of her, and according to the uncontradicted evidence given upon the hearing, she did anticipate that such would be her duties, and for their performance she considered herself entitled to be made his wife. Upon this subject Barbara Koch, who lived in the family as a domestic for some time, testified that Mrs. Rollwagen told her that "father was ashamed to get married; that he had promised to marry her and then he said he would not do it." "She said if he

did not marry her, and he died without their being married, people would laugh at her, and she would not stay in this way. She said if she stayed there and kept house, and Mr. Rollwagen died, people would laugh at her and say she had to be his wife any how, without marrying, and she would not have a bad character like this. She would not stay there without he married her." She also testified that Mr. Rollwagen informed her that he did not like living with his son Frederick, and said: "I think I would do better to take a place for myself and take somebody to keep house for me. I am old and sickly, and I don't like to get married again, and I mean to have somebody to take care of me. If I liked to get married, I can get plenty of women or young girls to get married to, but I am too old to get married; I am sickly and I don't like to get married again, but I think I would do better to take somebody to keep house for me and pay them by the month." Martha Miller, a witness and friend of the appellant, testified that she heard the decedent say that he must have somebody to take care of him, and that he had married Lena; that he must have somebody with him to attend him; that he liked her, and if he had had such care as he had from her he would have lived longer.

None of this evidence has been in any manner questioned, assailed or denied. If the appellant's statements had been incorrectly repeated it was within her own power to controvert that fact. But that she wholly failed to do. It may therefore be assumed that these statements were made by each party as they were given by the witnesses. And from them it clearly appears that affection had little or nothing to do with the marriage that was solemnized.

It was on the other hand, with both the parties to it, a matter of mere convenience and expediency. The evidence given by Barbara Shepherd confirmed this conclusion, which was entitled to some consideration as long as it was in harmony with the statements of the other witnesses, although she testified evasively on some subjects and was actuated by very decided feeling against the appellant. From the manner in which the marriage was produced, there was not the least probability that the decedent would be disposed to make any decided diversion of his property in favor of his wife; and nothing appears to have afterward occurred which could probably be supposed to make any change in his inclination in that respect. On the contrary, he received from his wife only the services and attention which his feeble and helpless condition required,

and he had previously expected to secure some person to perform for him. And for that he advanced her to a position of affluence from one of mere servility, in which she received but $14 a month by way of compensation.

Before that time, in repeated instances, he declared that his children and grandchildren were finally to have his property. It seemed to have been his purpose to restrain its actual division until his youngest grandchild attained the age of twenty-one years. But with that restriction, there can be no doubt but that it was his settled purpose that the property he had should ultimately be theirs. The existence of that design was declared to his friends, Stephan, Moser, Dugro, Moore, Hoch and Shepherd, and that design appears to have extended beyond his marriage to the appellant, for although he may have said to Mrs. Perry as she testified he did, that he would alter his will so as to give her the house he had bought, in place of the one he had given her, and afterward sold, that was in no way inconsistent with what the appellant said to Barbara Koch, when she told her " that father made a will, but that he did not give her any thing of her own, but he let her live in the house in Ninth street, and he gave her so much that she would be able to live good, but nothing for her own — that every thing after this, fell back to his children, and she had nothing for her own." This was a clear and explicit admission that in the will which had then been made, the design previously declared by the decedent to the other witnesses had been carefully carried into effect, subject only to a life estate given to the appellant in their place of residence, and it must have related to the Rosenstein will, for no other appears to have been made after their marriage until the instrument in controversy was executed. This statement must have been true, otherwise the appellant would have contradicted it as she was perfectly competent as a witness for that purpose. The evidence given by Bellesheim did not conflict at all with the truth of this statement. For while he thought he had made the instrument prepared by him the same as the one previously drawn by Rosenstein, except so far as it related to the house purchased and the exclusion of Beers as executor, he added that he could not say whether the house sold was devised in fee or only for life or widowhood in the preceding will. This statement of the appellant as to the fact remained uncontradicted, and as it was a probable one, and the witness in no way assailed or impeached,

the surrogate's court was at liberty to accept and act upon it as the truth. *Newton* v. *Pope*, 1 Cow. 109 ; *Dolsen* v. *Arnold*, 10 How. 528 ; *Lomer* v. *Meeker*, 25 N. Y. 361 ; *White* v. *Stillman*, id. 541. According to the evidence which Bellesheim gave he was directed by the appellant to prepare the first instrument made by him so as to carry out the design of the decedent, to give her the newly purchased residence in place of the other which had been sold. That, without any thing further, would not entitle her to have it in fee as long as the other had only been devised to her for life. Nothing was said about enlarging her interest in the estate. It was to be a mere substitution of one residence for the other. That intention was not expressed or in any way preserved, for the newly-drawn instrument contained a devise to her in fee of the residence which was merely to have been substituted in the place of the one that had been sold, and an absolute bequest of a third of the decedent's personal property.

It is not necessary to determine by whose agency or intervention this change was effected. The instrument produced for probate showed that it had been made, and that, too, when the enfeebled condition of the decedent would render him entirely incapable of detecting it from the mere reading of the instrument in his hearing, the only possible means he had for information on the subject. That was a fraud, and one which was of so material a character as to justly require that the instrument should not be admitted to probate. *Botsford* v. *McLean*, 45 Barb. 479, 486, 490 ; *Rider* v. *Powell*, 28 N. Y. 310 ; *Welles* v. *Yates*, 44 id. 525.

The testimony of Bellesheim, who drew both the instruments, shows that the instructions received by him were derived wholly from the appellant. It is true that she professed to convey only the wishes of the decedent, but there was no evidence whatever given that she did that, for no reliance could be placed on the nods and inarticulate sounds proceeding from him. And it was her interest to have the direction of his property changed as far as that could plausibly be done for the promotion of her own pecuniary advantage. In each instance she was the party who was really to be benefited. For if the child which was to be born was his, her rights were amply secured by the statute of the State. 2 R. S. 65, § 49.

In this respect his situation placed him peculiarly under her control. He was helpless and dependent and subject entirely to her influence. This is not a mere inference from his condition, and the

Rollwagen v. Rollwagen.

fact that she and her brother and mother were the only other inmates or occupants of the house besides the servant, for the proof which was given of her own statements shows that to have been the case. Stephan testified that she told him that Frederick Rollwagen, Jr., at one time wanted his father to sign some paper for him, and that he wanted to do it but she told him not to, and he did not. She said that papa would not do any thing unless she was satisfied with it; would not sign any papers. Mrs. Perry stated that he told her that Frederick wanted a power of attorney from him, but he would not give it; that they wanted to make a fool of him, so that when he wanted money he would have to go to them for it. But as that was in June, 1873, when the evidence fairly shows that he had lost the power of speech, no special reliance can be placed upon her evidence as to the fact. It appeared further that none of his children or grandchildren were allowed to be with him unless the appellant was present, and at the time when it was apparent that he was about to die, she declined to have them sent for, saying that he had directed that they should not attend him at that time, which, considering his feelings toward them, was certainly exceedingly improbable.

Under these circumstances, even if the decedent had been shown to have comprehended and assented to the changes made in the disposition he had provided should be made of his property by the Rosenstein will, as long as they were wholly for the benefit of the appellant, under whose direction and procurement they were effected, the presumption would be that they resulted from her influence, unduly and improperly exercised over him. This was substantially the doctrine of *Delafield* v. *Parish*, 25 N. Y. 9, 35, 36; *Tyler* v. *Gardiner*, 35 id. 559, 592, 593; *Nexsen* v. *Nexsen*, 2 Keyes, 229, 233; *Lee* v. *Dill*, 11 Abb. 214, and *Marvin* v. *Marvin*, decided by the Court of Appeals, but not reported.*

---

* The following is the decision referred to, which has not heretofore been published:

ACTION by George L. Marvin and another against Le Grand Marvin and others.

This action was one in partition, authorized by section 2 of chapter 238 of the Laws of 1853, in which the plaintiffs, as heirs at law of Sarah L. Marvin, have the right to contest the validity of the will of Mrs. Marvin. The Supreme Court ordered issues which were settled to be tried by a jury, and among these issues were two which the jury found against the will, to wit: That the testator executed the will under the restraint of Le Grand Marvin, and also that she executed the same under the undue influence of the said Le Grand.

On an application to the special term for a new trial, the same was denied, and judgment was given for the plaintiffs upon the issues found, setting aside the said will and decreeing

Rollwagen v. Rollwagen.

The presumption as to the codicil in this respect is still stronger than that attaching to the will, for it was said that the decedent had directed the change, on account of his wife's maternal con-

partition among the heirs at law. The defendants appealed to the general term from the judgment where the same was affirmed, and the defendants have appealed to this court. The questions material to be considered on this appeal will be stated in the opinion.

*E. B. Vedder* and *Le Grand Marvin*, for appellants.

*Sherman S. Rogers*, for respondent.

MASON, J. The appellants rely mainly upon alleged errors in the charge of the judge to the jury, in obtaining a reversal of the judgment and a new trial.

The testatrix, an aged lady in very feeble health, and when just upon the verge of the grave, and while living with the defendant Le Grand Marvin, executed the will in question, whereby she devised nearly all her estate real and personal, amounting to $75,000, to the said Le Grand. This will was drawn by the said Le Grand Marvin and executed under the circumstances above stated, while she was extremely feeble and but a very short time before her death, and by the will she entirely disinherited her only other son and heir, George L. Marvin.

The judge charged the jury in substance and effect that the legal presumption arising from the fact that this will was drawn by Le Grand Marvin, the principal legatee, was that the instrument was executed under undue influence, and that unless that presumption had been satisfactorily overcome by evidence given, the issues, so far as they involved the question of undue influence, should be found in favor of the plaintiff.

The charge must be regarded in its application to the case then on trial before the court, and the jury must have understood the judge as speaking in reference to the will in question, and the situations and relations existing between Le Grand Marvin and the testatrix. The judge was speaking of the legal presumption arising from this will, upon the undisputed facts surrounding its draft by this principal legatee.

Applied to the case before us, I do not think the charge is objectionable.

By the civil law such a will drawn by the legatee would be absolutely void, "*Qui se scripserit haeredem.*" *Crespell* v. *Dubois,* 4 Barb. 398; *Delafield* v. *Parish,* 25 N. Y. 35. The courts in England and in this country have not gone the length of the civil law and held such wills absolutely void, yet the better rule to be deduced from the adjudged cases is, that a presumption of undue influence shall be indulged against them when the testator is feeble, weak and in advanced old age. I do not mean to say that such legal presumption will be indulged in in every conceivable case, but the rule to be deduced from the adjudged cases in our own courts will fully justify this charge in its application to the case at bar. I will not go into a review of the cases, but content myself with referring to some of the most prominent. *Crespell* v. *Dubois,* 4 Barb. 393, 398; *Delafield* v. *Parish,* 25 N. Y. 9, 35, 36; *Barry* v. *Buttier,* 1 Circt. Eccl. 6, 37; *Lake* v. *Ranney,* 3 Barb. 49; *Stanton* v. *Weatherwax,* 16 id. 198, 30 id. 134; *Lee* v. *Dill,* 11 Abb. 214; *Newhouse* v. *Goodwin,* 17 Barb. 236.

The case shows that this legatee, who drew this will, is a lawyer, and was consequently her legal adviser in the drawing of the will, and the case comes very near the suspected relation of attorney and client where fraud or undue influence will be presumed from the relation of the parties. 9 Paige, 242; 4 Kent's Com. 438 (3d edition); 9 Ves. 292; 12 id. 372; 13 id. 138; 18 id. 125; 1 Hoffm. Ch. 421; 3 Sandf. 696; 10 Paige, 382; 11 id. 538; 16 N. Y. 285; 23 Barb. 430; Willard's Eq. Juris. 173, 174; 1 Story's Eq. Juris., § 310.

The charge of the judge upon the trial as to what constituted undue influence that will avoid a will, was clearly right. He instructed the jury that in order to constitute undue influence, within the meaning of the issues, it must be such an influence as in some degree destroyed the free agency of the testatrix and constrained her to do what was against her actual will or intention, and which she was unable to refuse, or too weak to resist. This is in strict conformity to the law. *Gardner* v. *Gardner,* 34 N. Y. 155; *Seguin* v. *Seguin,* 3 Keyes, 663, 669. Under such a definition as is embraced in this charge, the influence must be such as to deprive the testator of the exercise of her free will. 34 N. Y. 162; 3 Keyes, 669, 41 Penn. St. 312. Undue influence and restraint are synonymous terms in our law.

dition, while, according to the evidence given by Mrs. Miller, he knew that very well in the third month which could not have been later than March, 1873, as it appeared when the child was actually

There is at least no case of undue influence that would avoid a will that does not fall under the definition of restraint. If the coercion or influence over the mind of a testator is so strong as to destroy free agency in the act of making the will, then such person is certainly laboring under restraint, for the ascendency of another will over that of the testator to such an extent as that is just as much a restraint upon him as though it were produced by physical force. His own will no longer controls his actions, but the will of another. It is the same whether the effect is produced by physical force or actual coercion by some other instrumentality. There was no error, therefore, in the third paragraph of the judge's charge, in which he instructed the jury that if they found there was undue influence in this case they might find restraint also.

There may be an error in this paragraph of the charge, but it cannot avail the appellants, for it was against the plaintiffs instead of the defendants.

The judge did say "the testimony shows there was no restraint," and then left it to the jury to say whether the will was not executed under undue influence, which he instructed the jury must be influence so strong as to destroy the free agency of the testatrix and constrain her to do what was against her actual will or intention and which she was unable to refuse, or too weak to resist.

This calls for a finding literally of a restraint over the testatrix in making her will. It is but reasonable to say that the judge meant physical restraint when he told the jury that the testimony shows there is no restraint. We cannot impute to the judge the inconsistency of instructing the jury in the first place that the testimony showed there was no restraint and then leaving it to the jury to say whether there was or not.

There has been some mistake, probably, in the settlement of the case. It is not important how it arose, as the error, if any, was against the plaintiffs, and could not have prejudiced the defendants.

The issues were fairly submitted to the jury. The jury were left free in the charge to find the issues whether this will was executed under undue influence or restraint, and they have found both issues in favor of the plaintiffs, as they should have done if they found either in their favor.

I have examined carefully the rulings of the judge upon the trial upon questions of evidence, and I am not able to discover any errors therein calling for the reversal of the judgment. The court is not bound, in reviewing the trial of issues before a jury in equity cases, by the same technical rules that prevail on a bill of exceptions. If the court can see from the whole case that no error has been committed by the presiding judge prejudicial to the complaining party, and upon the whole case the verdict appears to be right, the court will not grant a new trial. *Lansing* v. *Russell*, 13 Barb. 510; 3 Barb. Ch. 325; *Anthorpe* v. *Comstock*, 2 Paige, 482; *Van Alsh* v. *Hunter*, 5 Johns. Ch. 148; *Lansing* v. *Russell*, 2 N. Y. 563; *Clayton* v. *Flanington*, 33 Barb. 144; 1 Sim. & S. 150; 2 Russell, 63; 1 Dow. (U. S.) 139.

In this class of cases a new trial will not be granted merely on the ground that the judge received improper testimony on the trial of the issues, or that he rejected that which is proper, if on the whole case the court is satisfied that the result ought not to have been different, if such testimony had been rejected in the one case or received in the other. 2 N. Y. 563; 2 Paige, 682; 1 Sim. & S. 150; 2 Russell, 63, and the cases last above cited.

The court hold a broader discretion as to granting new trials in such cases than they do in actions at law. And this is especially so where the issues in an equity case have been ordered to be tried by a jury. I do not think any of the rulings upon questions of evidence are erroneous; none certainly which will justify this court in granting a new trial. The verdict of the jury is justified by the evidence in the case, and the judgment should be affirmed.

For affirmance, MASON, WOODRUFF, GROVER, JAMES and DANIELS, JJ.

For reversal, LOTT and HUNT, JJ.

*Judgment affirmed.*

born.    If that had been the reason, the instrument propounded as his will would probably have contained all that was requisite for the protection of the interests of the child, which even then was expected to be born.    The truth is more likely to be found in the other circumstance that the change was attempted for the sole object of securing his wife the four lots upon avenue A.

If the wife had, as she said she had, acquired so much control over her husband as to prevent him from subscribing papers he was willing to execute, it is very easy to see that by the same means she could procure the execution of those she desired from him, for the promotion of her own individual interests, even though they might not otherwise receive the approval of the little judgment he was capable of exercising ; and that circumstance, together with the facts appearing in the evidence that the directions which were given for the changes made in the disposition of the decedent's property, all emanated from her without any reliable evidence of their approval by his uncontrolled judgment ; that they were exclusively for her benefit ; that the details of making them were substantially arranged and managed by her ; that neither of his children was on either occasion apprised of what was being done ; that no reason existed in his relations with, or feelings toward her or his children and grandchildren, which could naturally be expected to produce such changes, combined with his own enfeebled and dependent condition justify the conclusion adopted by the surrogate, that they resulted solely from the controlling influence exercised by her over him at the times when those changes were effected, and when he was too weak and too much reduced to maintain and exercise his own will concerning the propriety of his acts.

A very large number of authorities have been cited by the counsel for the appellant, showing under what circumstances it has been held that the proof of undue influence was insufficient to avoid testamentary dispositions of property, and the extent to which influence and importunity may be lawfully used.    But as none of them seem to bear upon the particular principle, applicable under the circumstances of this case, or on the propriety of its application to the facts appearing, no special reference to them can be required.

It is enough that the authorities relied upon appear to fully sustain the conclusion stated, without entering upon any examination

of others, that can in no sense be accepted as controlling upon the case established by the proof.

No injustice will be done to the appellant, by the result which has been maintained. For, as she expressed the fact herself, she " will be able to live good " on what she may lawfully secure from the decedent's estate, even though it shall revert to his children and grandchildren at the period of her own decease.

There was no error in the disposition which the surrogate's court made of the case, and the decree appealed from ought therefore to be affirmed, with costs.

*Decree affirmed.*